IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────

KEITH WATERS,

                    Plaintiff,          Civil Action No.
                                        9:13-CV-1437 (LEK/DEP)

        v.

ALBERT PRACK, *et al.*,

                    Defendants.

─────────────────────────────

APPEARANCES:

FOR PLAINTIFF:

KEITH WATERS, *Pro se*
06-A-2999
Wallkill Correctional Facility
Box G
Wallkill, NY 12589

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN          COLLEEN D.GALLIGAN, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 by plaintiff Keith Waters, a prison inmate who is proceeding *pro se* and *in forma pauperis*, against three employees of the New York State Department of Corrections and Community Supervision ("DOCCS"). In his complaint, Waters alleges that, during the course of disciplinary proceedings against him, the results of which were later annulled for non-compliance with DOCCS regulations, defendants deprived him of procedural due process and retaliated against him for complaining about the hearing officer and a disciplinary policy at the prison facility in which he was confined at the relevant times.

Currently pending before the court are the parties' cross-motions for summary judgment. For the reasons set forth below, I recommend that defendants' motion be granted in part and denied in part, and that plaintiff's motion be denied.

I.   BACKGROUND[1]

Plaintiff is a prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 42. While he is now incarcerated elsewhere, at the times relevant to his claims in this action, Waters was designated to the Coxsackie Correctional Facility ("Coxsackie"), and later to the Greene Correctional Facility ("Greene"), both of which are located in Coxsackie, New York. *Id.*

On January 18, 2013, plaintiff was issued a misbehavior report by a corrections sergeant who is not a named defendant, accusing him of accepting compensation in exchange for providing legal services to other inmates and violating a direct order from the law library officer prohibiting him from accepting remuneration for his services. Dkt. No. 42 at 4; Dkt. No. 110-4 at 2, 6. Although the misbehavior report was served upon plaintiff at Greene, it was based upon conduct that allegedly occurred at Coxsackie. Dkt. No. 110-4 at 6. The misbehavior report does not include the date, time, or location of the alleged offenses. *Id.*

_____

[1]   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). In this case, in light of the parties' cross-motions for summary judgment, the court draws "all factual inferences . . . against the party whose motion is under consideration." *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) (quotation marks omitted).

A Tier III disciplinary hearing was conducted by defendant Eric Gutwein, beginning on January 22, 2013, and concluding on March 21, 2013, to address the charges set forth in the misbehavior report.[2] Dkt. No. 110-4 at 2, 21-38. At the outset of the hearing, plaintiff objected that the misbehavior report did not provide him with sufficient information regarding the specific date, time, and place of the charged offense. Dkt. No. 110-4 at 22-23. Defendant Gutwein stated in a declaration submitted in support of defendants' pending motion that he proceeded with the disciplinary hearing over plaintiff's objection after determining that the misbehavior report and a letter accompanying the misbehavior report[3] "provided plaintiff with the requisite notice" to prepare a defense. *Id.* at 2. Defendant Gutwein's stated explanation for proceeding with the hearing, however, does not appear in the transcript of the hearing. *Id.* at 21-32.

At the culmination of the hearing, defendant Gutwein found plaintiff not guilty of refusing a direct order but guilty of providing unauthorized legal

---

[2] The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

[3] The letter attached to the misbehavior report was authored by the inmate who allegedly paid plaintiff for legal services. Dkt. No. 110-4 at 2, 7, 22.

assistance, and imposed a sanction that included three months of disciplinary special housing unit ("SHU") confinement, with a loss of packages, commissary, and telephone privileges for a corresponding period, and recommended that plaintiff forfeit three months of good time credits. Dkt. No. 110-4 at 31-32, 35-36.

Plaintiff appealed defendant Gutwein's determination to defendant Albert Prack who, prior to his retirement on December 31, 2014, was the director of the DOCCS Special Housing/Inmate Disciplinary Program. Dkt. No. 110-5 at 1. Defendant Prack affirmed the hearing officer's determination on May 8, 2013, concluding that the record did not reflect any due process violation and that substantial evidence supported defendant Gutwein's findings. Dkt. No. 110-5 at 2, 14.

On or about May 21, 2013, plaintiff commenced a proceeding pursuant to Article 78 of the New York Civil Practice Law and Rules challenging the Tier III determination. Dkt. No. 42 at 6; Dkt. No. 116-2 at 15-18. Plaintiff's Article 78 petition was granted by Supreme Court Justice Joseph C. Teresi on October 2, 2013. Dkt. No. 116-2 at 15-18. In his decision, Justice Teresi concluded that the misbehavior report failed to

comply with the notice requirements under 7 N.Y.C.R.R. § 251-3.1,[4] and ordered that the hearing officer's determination be annulled and all references to it be expunged from plaintiff's records. *Id.* at 17. By the time the Article 78 determination was issued and implemented, plaintiff had already served seventy days of the three-month SHU confinement ordered by defendant Gutwein. Dkt. No. 42 at 13.

In addition to his claims against defendants Gutwein and Prack, plaintiff alleges that defendant Arthur Dirie, who at the relevant times served as the Deputy Superintendent of Security at Greene and, at some unidentified point in time, as the facility's Acting Superintendent, (1) refused to undertake a review of plaintiff's appeal from the Tier III hearing determination, (2) transferred plaintiff to a different correctional facility, and (3) removed plaintiff from his law library clerk position at Greene – all in retaliation for plaintiff complaining to him concerning defendant Gutwein's

---

[4]    Justice Teresi cited 7 N.Y.C.R.R. § 251-3.1(a) as the provision that defendant Gutwein's determination allegedly violated. Dkt. No. 116-2 at 16, 17. Justice Teresi further elaborated that the provision requires misbehavior reports to "'set forth the date, time and place of the offense[.]'" *Id.* at 16. Section 251-3.1(a) actually provides, however, that "[e]very incident of inmate misbehavior involving life, health, security or property must be reported, in writing as soon as practicable." 7 N.Y.C.R.R. § 251-3.1(a). In light of the remainder of Justice Teresi's decision, I have assumed that Justice Teresi found that the misbehavior report violated section 251-3.1(c)(3), which states that "[t]he misbehavior report shall include . . . the date, time and place of the incident," 7 N.Y.C.R.R. 251-3.1(c)(3), and that his citation to section 251-3.1(a) was in error. *See* Dkt. No. 116-2 at 16-17 (Justice Teresi finding that "the Misbehavior Report failed to properly set forth the date and time of the offense.").

bias during the Tier III hearing and a dormitory sanction policy in place at Greene. Dkt. No. 42 at 4-6.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on or about November 20, 2013, and subsequently filed a first amended complaint on November 25, 2013, with court approval. Dkt. Nos. 1, 33, 34. A second amended complaint ("SAC"), the currently operative pleading, was filed by plaintiff on December 15, 2014, again with leave of court. Dkt. Nos. 39, 41, 42. Plaintiff's SAC asserts procedural due process and retaliation claims against defendants Gutwein, Prack, and Dirie. Dkt. No. 42 at 8-11; Dkt. No. 110-3 at 1.

On April 29, 2016, following the close of discovery, defendants moved for the entry of summary judgment dismissing plaintiff's remaining claims. Dkt. No. 110. Plaintiff has opposed that motion and cross-moved, for the second time the entry of summary judgment in his favor.[5] Dkt. No. 116. Defendants have since submitted papers in opposition to plaintiff's cross-motion. Dkt. No. 120. The parties' cross-motions, which are now fully briefed, have been referred to me for the issuance of a report and

---

[5]    Plaintiff's first motion for summary judgment, filed prior to the exchange of any meaningful discovery in the case, was denied. Dkt. Nos. 24, 64, 73.

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to

meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where the parties have filed cross-motions for summary judgment, "a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Boy Scouts of Am. V. Wyman*, 335 F.3d 80, 88 (2d Cir. 2003) (quotation marks omitted).

B.    Procedural Due Process

In the first of his two remaining claims, plaintiff alleges that defendant Gutwein deprived him of his right to procedural due process during the course of his Tier III disciplinary. *See, e.g.,* Dkt. No. 42 at 8.

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual property or liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). In this case, defendants contend that plaintiff was not deprived of a cognizable liberty or property interest as a result of defendant Gutwein's determination. Dkt. No. 110-2 at 6-9.

Liberally construed, plaintiff's SAC and his papers submitted in response to defendants' motion identify five alleged deprivations as a result of the Tier III determination, including (1) his SHU confinement, (2) the recommended loss of good time credits, (3) the denial of an area of preference transfer whereby he would be moved to a prison facility closer to his home, (4) the loss of his position as a law library clerk and the

corresponding deprivation of wages, and (5) the loss of telephone and commissary privileges.[6] *See generally* Dkt. Nos. 42, 116.

### 1. SHU Confinement

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest deprivation in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See*, *e.g.*, *LaBounty v.*

---

[6]     It is worth noting that in plaintiff's memorandum of law, submitted both in response to defendants' motion and in support of his cross-motion, plaintiff focuses on whether he was afforded sufficient process during the disciplinary hearing. Dkt. No. 116 at 7-12. He does not address defendants' arguments with respect to whether he possessed a protected liberty interest. Although consideration of the process afforded to plaintiff during the disciplinary hearing is certainly relevant to the analysis, he cannot prevail on a due process claim unless he establishes that he was denied a cognizable liberty interest. *See Bedoya*, 91 F.3d at 351-52 ("To award damages under 42 U.S.C. § 1983 for alleged violation of procedural due process, a court must . . . [engage in] a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest . . . '; *and, if so,* (2) whether the deprivation of that liberty interest occurred without due process of law." (emphasis added) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460-61 (1989)).

*Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).[7] Accordingly, at this juncture the court must inquire whether there is sufficient record evidence from which a reasonable factfinder could conclude that the conditions of plaintiff's SHU confinement rose to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[8] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving relatively brief periods of segregated confinement, where the plaintiff has not alleged any unusual conditions a court may not need to

---

[7] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[8] In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

undertake a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

In cases like this one that involve restrictive confinement of less than 101 days, where the confinement occurs under ordinary conditions found in a typical SHU setting, the disciplinary punishment does not rise to the level of an atypical and significant hardship.[9] *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required in order to establish a protected liberty interest. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). In such a case the court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.'" *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir.1999)).

---

[9]     On the other hand, the Second Circuit has suggested that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

In this instance, there is no evidence in the record suggesting that, while serving his disciplinary sentence, plaintiff was exposed to conditions that vary from the ordinary incidents of SHU confinement. Accordingly, and because the duration of his SHU confinement was less than 101 days, no reasonable factfinder could conclude that this represented a deprivation of plaintiff's protected liberty interests.

2.   <u>Good Time Credits</u>

In his hearing determination, defendant Gutwein recommended that plaintiff forfeit three months of good time credits. Dkt. No. 110-4 at 31-32, 35. As a result of New York State Supreme Court Justice Teresi's decision granting plaintiff's Article 78 petition and the ensuing annulment of defendant Gutwein's determination, however, plaintiff did not actually lose any good time credits. Dkt. No. 116-2 at 17. Moreover, there is no record evidence suggesting that plaintiff was otherwise disadvantaged by the hearing officer's good-time recommendation with respect to his potential release date. Accordingly, this aspect of the hearing officer's determination does not provide a basis to conclude that plaintiff was deprived of a protected liberty interest.

### 3.     Area of Preference Transfer

Plaintiff also claims the existence of a cognizable liberty interest in being transferred to a prison facility closer to home, and that he was deprived of that opportunity as a result of the hearing officer's determination. *See, e.g.,* Dkt. No. 42 at 4. It is well established, however, that "[a] prisoner has no liberty interest in remaining at a particular correctional facility[.]" *David v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998). Accordingly, no reasonable factfinder could conclude that plaintiff possessed, but was denied, a cognizable liberty interest in being transferred to a facility closer to home.[10]

### 4.     Law Library Clerk Position

Plaintiff further contends that, as a result of defendant Gutwein's determination, he was deprived of the opportunity to work as a law library clerk at Greene. Dkt. No. 42 at 10. It is well settled, however, that inmates do not have a constitutionally protected right to a prison job. *Frazier v. Coughlin*, 81 F.3d 313, 318 (2d Cir. 1996). Accordingly, plaintiff was not deprived of a cognizable liberty or property interest when he lost the

---

[10]     It appears, moreover, that plaintiff was reinstated in the area-of-preference program, which allows inmates to be transferred to facilities closer to loved ones, on December 18, 2013. Dkt. No. 42 at 7.

15

opportunity to serve as a law library clerk, allegedly as a result of defendant Gutwein's hearing determination.[11]

### 5. Telephone and Commissary Privileges

The final deprivation alleged by plaintiff to implicate a cognizable liberty or property interest concerns the loss of his telephone and commissary privileges while in SHU confinement. Such privileges, however, do not constitute protected liberty or property interests. *See Johnson v. Enu*, No. 08-CV-0158, 2011 WL 3439179, at *12 (N.D.N.Y. July 13, 2011) (Homer, M.J., *report and recommendation adopted by* 2011 WL 3439524 (N.D.N.Y. Aug. 5, 2011) (Scullin, J.)) ("Moreover, the loss of phone, telepackage, and commissary privileges does not give rise to a protected liberty interest under New York law." (quotation marks omitted)); *Pitsley v. R. Ricks*, No. 96-CV-0372, 2000 WL 362023, at *4 (N.D.N.Y. Mar. 31, 2000) (Mordue, J.) (recognizing that prison inmates to not enjoy a constitutional right to unlimited telephone use (citing cases)); *DeMaio v. Kelly*, No. 95-CV-0329, 1996 WL 685729, at *2 (W.D.N.Y. Nov. 22,1996) ("Loss of certain privileges – *viz.*, recreation, special events, telephone and packages

---

[11] It is worth noting that it is far from clear that plaintiff was removed from his position as a law library clerk as a result of defendant Gutwein's disciplinary hearing determination. There is record evidence suggesting instead that plaintiff was removed from his position prior to the conclusion and pending the results of the disciplinary hearing. Dkt. No. 24 at 23.

– does not represent the type of grievous loss which could reasonably be viewed as imposing an atypical and significant hardship on a prison inmate."). Accordingly, no reasonable factfinder could conclude that a three-month deprivation of telephone and commissary privileges rises to a level sufficient to support a procedural due process violation.

In sum, because plaintiff has failed to demonstrate a genuine dispute of material fact with respect to whether he was deprived a cognizable liberty or property interest resulting from defendant Gutwein's disciplinary hearing determination, I recommend that defendants' motion be granted with respect to plaintiff's due process claims asserted against defendant Gutwein.[12]

C.     Retaliation

Plaintiff alleges that defendant Gutwein's determination, as well as the subsequent affirmance by defendant Prack, were the product of unlawful retaliation. *See, e.g.,* Dkt. No. 42 at 8-9. Specifically, he contends that both defendants Gutwein and Prack acted with retaliatory animus in light of their

---

[12]     To the extent that plaintiff has asserted a due process claim against defendant Prack for affirming defendant Gutwein's determination, I recommend that it also be dismissed. *See, e.g., Lopez v. Whitmore*, No. 13-CV-0952, 2015 WL 4394604, at *11 (July 16, 2015) (Sannes, J., *adopting report and recommendation by* Baxter, M.J.) (dismissing due process claims against defendant Prack "[b]ecause his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court . . . found comported with due process").

knowledge of plaintiff's complaints regarding (1) a dormitory sanction policy at Greene and (2) defendant Gutwein's delays in completing the disciplinary hearing. *Id.* In addition, plaintiff maintains that, in retaliation for his complaints about defendant Gutwein's alleged bias during the Tier III hearing and Greene's dormitory sanction policy, defendant Dirie (1) failed to undertake a review of the disciplinary hearing, (2) caused plaintiff to be transferred to a different correctional facility, and (3) removed plaintiff from his position as a law library clerk. *See, e.g., id.* at 9-10. In their motion, defendants seek dismissal of the retaliation claims, arguing that there is no record evidence from which a reasonable factfinder could conclude that they retaliated against plaintiff. Dkt. No. 110-2 at 9-14.

A prison official engages in unlawful retaliation when he takes adverse action against an inmate, motivated by that inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988). To establish such a claim, a plaintiff must prove that (1) he engaged in protected activity; (2) the defendants took adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action – in other words, the protected conduct was a "substantial or motivating factor" and the prison official's decision to take action against the

plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274,

287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v.

Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3,

2003) (Sharpe, M.J.). If the plaintiff succeeds in carrying this burden,

defendants may nonetheless avoid liability by showing, by a preponderance

of the evidence, that they would have taken the same action against the

plaintiff "even in the absence of the protected conduct." *Mount Healthy*, 429

U.S. at 287. If taken for both proper and improper reasons, defendants'

actions may be upheld if the same action would have been taken based

solely on the proper reasons. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.

1996) (citations omitted).

        1.    <u>Defendant Gutwein</u>

     There is record evidence suggesting that plaintiff lodged two

complaints that he claims served as the basis for defendant Gutwein's

allegedly retaliatory disciplinary hearing determination and sanction. In his

SAC, plaintiff alleges that defendant Gutwein retaliated against plaintiff

"with the imposition of ninety days SHU confinement and loss of good time

credits" after learning that plaintiff wrote "complaints [to Gutwein's]

supervisors." Dkt. No. 42 at 8. Plaintiff's SAC alleges both that plaintiff

"made written and oral complaints to supervisory staff" regarding the

dormitory sanction policy and that, "[a]t different dates and time intervals[,] plaintiff made written complaints about hearing officer Gutwein's impartiality [sic] to defendant Prack and Dirie in conducting the hearing." *Id.* According to plaintiff, defendants Prack and Dirie notified defendant Gutwein of plaintiff's "written complaints of his biasness and impartiality [sic] in conducting the disciplinary hearing against plaintiff." *Id.* In plaintiff's affidavit submitted in opposition to defendants' motion and in support of his cross-motion, he repeats his allegation that defendant Gutwein was aware of plaintiff's complaints regarding the dormitory sanction policy. Dkt. No. 116- 2 at 12. Specifically, plaintiff contends as follows:

> Gutwein offered plaintiff a favorable decision at the disciplinary hearing that would result in rescission of the law library suspension and removal and processing of plaintiff's preference transfer for plaintiff's discontinuance of the complaints and intention to file a grievance or legal action challenging the dorm sanction policy.

*Id.*

In response to plaintiff's assertions, defendant Gutwein states that he was unaware of any complaints lodged against him at the time of the hearing, and that "[a]t no time during the hearing did [he] offer plaintiff a deal wherein [he] would find [plaintiff] not guilty of the charges in exchange for his silence with regard to the dorm sanction policy." Dkt. No. 110-4 at 3-4. The

competing sworn testimony from both plaintiff and defendant Gutwein

regarding whether plaintiff lodged the complaints as alleged, and whether

defendant Gutwein learned of them, presents a dispute of fact that cannot

be resolved at the summary judgment stage. In order to resolve the conflict,

I would be forced to render a credibility determination that is prohibited at

this procedural juncture.

This finding, however, does not end the inquiry. As was previously

noted, once a *prima facie* case of retaliation is established, a defendant may

nonetheless avoid liability by showing, by a preponderance of the evidence,

that he would have taken the same action even in the absence of the

protected conduct. *See, e.g., Mount Healthy*, 429 U.S. at 287. In this

instance, even assuming a factfinder concludes that there is also record

evidence to support a finding that defendant Gutwein rendered his

disciplinary hearing determination out of retaliatory animus, there is

evidence from the disciplinary hearing record that supports defendant

Gutwein's determination finding plaintiff guilty of receiving compensation for

providing legal services. More specifically, at the disciplinary hearing,

Sergeant Melendez, the officer who authored the misbehavior report,

testified that, in addition to finding the letter addressed to plaintiff from

another inmate in which the inmate inferred (but did not explicitly state) that

he would compensate plaintiff for assisting him with a legal matter in the same way he had in the past, Dkt. No. 110-4 at 7, Sergeant Melendez also confronted the inmate who wrote plaintiff the letter, and the inmate admitted that he had paid plaintiff in the past for legal assistance. *Id.* at 26. Although plaintiff denied receiving compensation for legal services at the hearing, *id.* at 22, Sergeant Melendez's testimony and the letter from the inmate addressed to plaintiff provide sufficient record evidence from which defendant Gutwein could have found plaintiff guilty absent any retaliatory motive.

A plaintiff's retaliation claim will "not survive summary judgment under *Mount Healthy* if the defendants meet their burden of showing that there is no genuine issue as to the fact that [the plaintiff] would have received the same punishment even if they had not been improperly motivated." *Graham*, 89 F.3d at 80. Because there is evidence from the disciplinary hearing record that supports defendant Gutwein's determination, and defendant Gutwein stated in his declaration that he would have imposed the same sanction against any inmate that he had found guilty of violating the same prison rule, Dkt. 110-4 at 3, I find that plaintiff's retaliation claim fails because defendant Gutwein would have taken the same action against plaintiff absent the constitutionally protected conduct. *See Graham*, 89 F.3d

at 79 ("[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone."). Accordingly, I recommend that the portion of defendants' motion seeking dismissal of plaintiff's retaliation claim asserted against defendant Gutwein be granted.

## 2.    Defendant Dirie

With respect to the first element of plaintiff's retaliation claim asserted against defendant Dirie, plaintiff alleges that he complained to defendant Dirie and threatened to file a grievance regarding a dormitory sanction policy at Greene, and additionally that he complained to defendant Dirie about defendant Gutwein's bias during, and delays in completing, the disciplinary hearing. *See, e.g.,* Dkt. No. 42 at 5; Dkt. No. 116-2 at 11-12. Defendant Dirie does not recall receiving any of plaintiff's verbal complaints, and there is no record that plaintiff actually filed any grievances as threatened. Dkt. No. 110-3 at 2. Although courts in this circuit have held that even just a threat of filing a grievance constitutes constitutionally protected conduct, *see, e.g., Coleman v. Beale*, 636 F. Supp. 2d 207, 211 (W.D.N.Y. 2009), there is no independent record evidence to substantiate plaintiff's mere allegations that he lodged the complaints with defendant Dirie. Nonetheless, mindful of the procedural posture of this matter, and that it is

not appropriate to render credibility determinations at the summary judgment stage, I find there is a genuine dispute of material fact with respect to whether plaintiff engaged in constitutionally protected conduct by complaining to defendant Dirie.

Plaintiff's SAC alleges that defendant Dirie took three adverse actions against him in retaliation for complaining about defendant Gutwein and the dormitory sanction policy. In particular, he contends that defendant Dirie (1) refused to review defendant Gutwein's disciplinary determination on appeal, (2) requested that plaintiff be transferred from Greene "for the sole purpose of punishment and to interfere with plaintiff's association in person with his daughter at a facility closer to the New York City area," and (3) ordered that plaintiff be removed from his position as a clerk in the law library. Dkt. No. 42 at 9-10; *see also* Dkt. No. 116 at 14-15.

With respect to plaintiff's first allegation of adverse action, aside from plaintiff's bare allegations, there is no record evidence from which a reasonable factfinder could conclude that defendant Dirie had the authority to conduct a review on appeal of a disciplinary determination. Defendant Dirie flatly denies possessing such authority as Deputy Superintendent of Security, Dkt. No. 110-3 at 4. Because the only record evidence that supports plaintiff's allegation that defendant Dirie should have intervened

and undertaken an independent review of the disciplinary hearing consists of plaintiff's own speculative statements, I recommend that defendants be granted summary judgment with respect to this portion of plaintiff's retaliation claim. *See, e.g., McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) ("In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages."); *Odom v. Matteo*, 772 F. Supp. 2d 377, 399 (D. Conn. 2011) ("[T]he conclusory, unsubstantiated allegations contained in the Amended Complaint are insufficient to permit a reasonable jury to find in [the plaintiff]'s favor on her negligence claim against [the defendants]." (citing cases)).

Next, plaintiff alleges that defendant Dirie ordered or requested that plaintiff be transferred to a different correctional facility "for the purpose of punishment and to interfere with plaintiff's association in person with his daughter at a facility closer to the New York City area." Dkt. No. 42 at 10. Although defendant Dirie acknowledges that he "can make a request that an inmate be transferred [to a different prison] for the safety of the facility," he denies requesting that plaintiff be transferred out of Greene in 2013. Dkt. No. 1103-3 at 4. Again, because the only evidence in the record that support's plaintiff's allegations are his own, unsupported statements, I

recommend that defendants' motion be granted with respect to this element of plaintiff's retaliation claim.

Lastly, plaintiff alleges that defendant Dirie removed him from his position as a law library clerk at Greene in retaliation for plaintiff complaining about defendant Gutwein and the dormitory sanction policy at Greene. Dkt. No. 42 at 10. In response, defendant Dirie merely states that he "advised plaintiff that he had been removed from his position in the law library pending the results of his tier hearing." Dkt. No. 110-3 at 3. He also contends that he "did not order plaintiff's removal from his job in the law library, his removal was due to his pending disciplinary hearing." *Id.*

There is record evidence suggesting that plaintiff applied and was chosen for the law library clerk position at Greene after he had already been issued the misbehavior report that triggered the disciplinary hearing. Indeed, plaintiff contends that he began the job on February 11, 2013, approximately three weeks after he had been issued the misbehavior report and the disciplinary hearing had commenced. Dkt. No. 116 at 15. It appears from the record that plaintiff was removed from his position on or about March 19, 2013. Dkt. No. 110-3 at 3-4; *see also* Dkt. No. 24 at 23. Defendants do not provide any explanation for why plaintiff was appointed as a law library clerk while the disciplinary charges were pending if, as

26

defendant Dirie implies, inmates are not permitted to hold a law library clerk position during the pendency of a Tier III hearing. *Id.* In light of the absence of any explanation in this regard, and the close temporal proximity between plaintiff's alleged complaints to defendant Dirie and the termination of plaintiff's position as a law library clerk, I find there is sufficient record evidence to give rise to a genuine dispute of material fact as to whether there is a causal connection between plaintiff's constitutionally protected conduct and defendant Dirie's alleged adverse action. Accordingly, I recommend defendants' motion be denied with respect to this aspect of plaintiff's retaliation claim.

### 3.    Defendant Prack

Even at this late stage in the litigation, the allegations surrounding plaintiff's retaliation cause of action asserted against defendant Prack remain unclear. Based on my review of the allegations in plaintiff's SAC and his filings submitted in connection with the pending motions, it appears plaintiff alleges that, in retaliation for plaintiff writing to defendant Prack about the dormitory sanction policy and defendant Gutwein's bias during the disciplinary hearing, defendant Prack took adverse action against him by (1) affirming defendant Gutwein's disciplinary determination and (2) approving defendant Gutwein's requests for extensions of the disciplinary hearing.

Dkt. No. 42 at 6, 7, 9; Dkt. No. 116 at 19. Fatal to plaintiff's claims, however, is the lack of any evidence, aside from plaintiff's naked assertions, that defendant Prack learned of plaintiff's complaints concerning the dormitory sanction policy and defendant Gutwein's alleged bias during the disciplinary hearing. There is record evidence reflecting that plaintiff wrote a letter to the former DOCCS Commissioner Brian Fischer on or about March 18, 2013, complaining about how the misbehavior report failed to include "what specific act or rule violation" he was being charged with and that the disciplinary hearing had not yet been concluded in accordance with the relevant regulations, and that the letter was forwarded to defendant Prack for a response. Dkt. No. 110-5 at 16. Conspicuously, absent from plaintiff's letter, however are any complaints about the dormitory sanction policy and defendant Gutwein's bias during the disciplinary hearing. *Id.* Although plaintiff's SAC includes vague allegations that he informed defendant Prack about the dormitory sanction policy "[a]t different dates and time intervals during the period of January – March 2013," and wrote "complaints about hearing officer Gutwein's impartiality to defendant Prack," there is no other record evidence to support these assertions. Dkt. No. 42 at 5. Because of the absence of any independent record evidence that supports plaintiff's allegation that defendant Prack became aware of plaintiff's complaints

regarding the dormitory sanction policy and defendant Gutwein's bias allegedly displayed during the disciplinary hearing, I find that no reasonable factfinder could conclude that defendant Prack's decision to provide an extension of time to defendant Gutwein to complete the hearing and his affirmance of the disciplinary determination were motivated by retaliatory animus. For that reason, I recommend that defendants' motion be granted with respect to plaintiff's retaliation claim against defendant Prack.

IV.    SUMMARY AND RECOMMENDATION

The remaining two causes of action in this matter concern plaintiff's allegations that his due process rights were violated during the course of a disciplinary hearing conducted by defendant Gutwein, the results of which were affirmed by defendant Prack, and that defendants Gutwein, Prack, and Dirie retaliated against him for engaging in constitutionally protected activity. With respect to the procedural due process claim, no reasonable factfinder could conclude that plaintiff was deprived of a cognizable liberty or property interest. Accordingly, his procedural due process claim fails. Turning to the claims of retaliation, while there is sufficient evidence from which a reasonable factfinder could conclude that defendant Dirie retaliated against plaintiff by removing him from his law library clerk position, plaintiff's remaining retaliation claims fail for various reasons, including the absence

of any record evidence that plaintiff engaged in protected activity and any evidence from which a reasonable factfinder could conclude there is a causal connection between plaintiff's protected activity and the alleged adverse action. Accordingly, it is hereby respectfully

RECOMMENDED that plaintiff's motion for summary judgment (Dkt. No. 116) be DENIED, and that defendants' motion for summary judgment (Dkt. No. 110) be GRANTED in part and DENIED in part as follows:

(1)     Plaintiff's due process claims asserted against defendants Gutwein and Prack should be DISMISSED;

(2)     Plaintiff's retaliation claim asserted against defendant Gutwein should be DISMISSED;

(3)     Plaintiff's retaliation claims asserted against defendant Dirie regarding his failure to undertake a review of the disciplinary hearing determination and his alleged transfer of plaintiff to a different correctional facility should be DISMISSED;

(4)     Plaintiff's retaliation claim asserted against defendant Dirie regarding his removal of plaintiff as a law library clerk at Greene should survive defendants' motion and proceed to trial;

(5)     Plaintiff's retaliation claims asserted against defendant Prack should be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[13] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      February 24, 2017
            Syracuse, New York

---

[13]      If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mark LABOUNTY, Plaintiff,
v.
Philip COOMBE, Jr., Wayne Strack, and Donald
Selsky, Defendants.
No. 95 CIV 2617(DLC).

Dec. 26, 2001.

Mark LaBounty, Pro Se, Marcy Correctional Facility,
Marcy, for Plaintiff.

Michael J. Keane, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, for Defendants.

OPINION AND ORDER

COTE, District J.

**\*1** On April 17, 1995, Mark LaBounty ("LaBounty"),
who is presently incarcerated at Marcy Correctional
Facility, brought this action *pro se* pursuant to 42 U.S.C.
§ 1983 ("Section 1983"), alleging that the defendants
violated his constitutional rights while he was an inmate at
Fishkill Correctional Facility ("Fishkill"). On November
25, 1996, the Court granted in part the defendants' motion
to dismiss. On February 5, 2001, the Court of Appeals for
the Second Circuit vacated in part the November 25, 1996
decision, and remanded LaBounty's procedural due
process claim for further development.FN1 This claim stems
from LaBounty's wrongful confinement in "SHU" for 30
days, a claim that this Court had dismissed for failure to
identify a violation of a liberty interest. After discovery,
defendants now move for summary judgment. For the
reasons set forth below, the motion is denied.

FN1. The claims brought by the plaintiff that
survived summary judgment were tried before a
jury on October 4, 1998. On October 6, 1998,
the jury returned a verdict for LaBounty on his
claim that Nurse Millie Rivera had been

deliberately indifferent to his serious medical
needs and awarded him $1 in nominal damages.
The Second Circuit denied the appeals from the
trial and the summary judgment opinion, but
reversed the dismissal of the due process claim at
issue here. *LaBounty v. Kinkhabwala,* No.
99-0329, 2001 WL 99819 (2d Cir. Feb. 5, 2001).

BACKGROUND

LaBounty's allegations against the defendants are
fully described in the Court's November 25, 1996 Opinion,
familiarity with which is presumed. *LaBounty v.
Coombe, et al.,* No. 95 Civ. 2616, 1996 WL 684168
(S.D.N.Y. Nov. 25, 1996). Here, the Court only describes
those facts necessary for the purposes of this motion.FN2

FN2. To the extent that the plaintiff reiterates in
his opposition claims that have been previously
dismissed or makes new claims unrelated to the
issues which have been remanded, those claims
are not properly before this Court and the Court
does not consider them here.

By Order dated February 13, 2001, the Court
described the issues remanded by the Court of Appeals for
further development as follows:

1. The plaintiff's procedural due process claim that the
disciplinary hearing held on January 23 and 27, 1995
was delayed, that witnesses at that hearing were
examined outside his presence, and that Vuturo
prejudged the merits of the hearing.

2. Whether plaintiff's due process rights were violated
while he was in SHU during the period beginning on
January 27, 1995, by

(a) a denial of medication for his ear infection;

(b) the prescription of Flexeril for a back condition;

(c) Nurse Rivera substituting his back pain medication
with an unknown drug which caused him dizziness and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

head and stomach aches;

(d) a denial of paper and pencils;

(e) a denial of out-of-cell exercise;

(f) a denial of access to library books;

(g) not being permitted to mail letters in the evening; and

(h) the censorship or destruction of his mail, legal documents, and personal papers.

3. Whether, under *Sandin v. Conner,* 515 U.S. 472 (1995) and its progeny, the plaintiff has a liberty interest sufficient to bring the due process claims described in items 1 and 2.

The parties were ordered to inform the Court if they had any other understanding of the Court of Appeals' Order of remand.

By letter dated February 27, 2001, the defendants agreed that the February 13, 2001 Order correctly described the remanded issues. By letter dated February 17, 2001, the plaintiff also agreed with the description of the issues, but indicated a wish to add three additional issues. By Order dated February 28, 2001, the Court found that the issues remanded for further development were those described in the February 13, 2001 Order.

**\*2** The following facts are undisputed or as shown by the plaintiff unless otherwise noted. On January 12, 1995, LaBounty went to the clinic at Fishkill to renew his prescriptions for hypertension medication, and to complain of an ear infection. On that day, Nurse Ronald Waller issued an "Inmate Misbehavior Report" against him, which included the charge of refusing a direct order. Also on that day, Robert L. Macomber issued a "Inmate Misbehavior Report" against LaBounty, which included the charge of possessing outdated medications in his cell.

*Tier III Hearing*

On January 23 and 27, 1995, hearing officer Joseph

Vuturo ("Vuturo") conducted a "Tier III" disciplinary hearing to address the charges against plaintiff. [FN3] On January 27, Vuturo found LaBounty guilty of violating a direct order and possessing outdated medications. Vuturo sentenced LaBounty to 90 days of segregated confinement in the Special Housing Unit ("SHU"), of which 60 days were suspended. LaBounty served 30 days in SHU, beginning on January 27, 1995.

> FN3. Tier III hearings are held for " 'the most serious violations of institutional rules." ' *Colon v. Howard,* 215 F.2d 227, 230 n. 1 (2d Cir.2000) (citation omitted).

On January 27, 1995, LaBounty appealed his conviction to the Commissioner of the Department of Correctional Services ("DOCS"). On March 22, 1995, the DOCS Director of the Special Housing / Inmate Disciplinary Program, defendant Donald Selsky ("Selsky"), reversed LaBounty's conviction on the charge of possessing outdated medication because the "[m]isbehavior report fail[ed] to support [the] charge." On February 6, 1996, Selsky "administratively reversed" plaintiff's conviction on the only remaining charge-disobeying a direct order-"due to off-the-record communication used as evidence in hearing." Selsky directed that any records containing references to the January 27, 1995 hearing be expunged.

*SHU Conditions*

The SHU regulations provide that, while in SHU, inmates are confined to their cells for 23 hours a day, and are permitted to leave their cells for recreation, visits to the medical department, legal visits, guidance or counselor interviews, and for showers two times per week. SHU may be imposed for disciplinary and non-disciplinary, or administrative, reasons. Between January 1, 1991 and December 31, 1996, 162,601 of the 215,701 inmates in the New York correction system received "confinement sanctions." 106,265 inmates were penalized by "keeplock" confinement. In 1993, 4.2% of the inmates in DOCS' confinement were sentenced to SHU, and in 1994, 4.8% were sentenced to SHU.

*Plaintiff's Experience in SHU*

While in SHU, LaBounty was deprived of all of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

pain medication which had been prescribed for "constant severe pain related to his spinal condition," [FN4] as well as medication for an ear infection. LaBounty complained to defendant Nurse Rivera and to other medical staff that he was not receiving his pain medication and that he was suffering from an ear infection, but he received no response from them. On February 13, 1995, LaBounty was prescribed "Flexeril" by a physician's assistant, but LaBounty claims the medicine was merely prescribed as a "pretext" and that it did not help his severe pain or his ear infection. LaBounty was in "constant severe pain for the duration of his 30-days in SHU." LaBounty was not treated for his ear infection until he was released from SHU and given a CAT Scan. The CAT Scan revealed that the ear infection had become "Mastoiditis." As a result of the untreated ear infection, LaBounty lost the hearing in his right ear.

> FN4. Plaintiff asserts that his spinal condition was, at all relevant times, well-documented and diagnosed.

**\*3** While he was in SHU, LaBounty was prescribed one refill of his hypertension medication. A nurse gave the refill to officers, but the officers refused to give plaintiff his medication. After LaBounty repeatedly threw his bed against the cell door, the SHU evening supervisor came to his cell and later ordered the SHU officer to give LaBounty his medication.

While he was in SHU, LaBounty was deprived of any "out-of-the-cell exercise," which he requested each day. He was given only two showers during his 30 days in SHU, and each shower was only one to two minutes long. He requested a pen from the SHU officer in order to write his appeal to the Commissioner, and the officer refused. Plaintiff later received a pen from the "porter." [FN5] Plaintiff requested other writing materials from the officers, but they did not give him any. LaBounty received all of his writing materials from the porter and other inmates when they were let out for exercise. Before he was released from SHU, the officers opened LaBounty's "property bags" and "removed legal material relevant to this case and other pending cases." LaBounty was refused books and newspapers while he was in SHU despite requesting them.

> FN5. A porter is an inmate who is also serving a sentence in SHU.

DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. See Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir.1994). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P. See also Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

Where, as here, a party is proceeding *pro se,* this Court has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994). Nonetheless, a *pro se* party's "bald assertion," completely unsupported by evidence, is insufficient to overcome a motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991).

A. *Protected Liberty Interest*

**\*4** A claim for procedural due process violations requires a determination of "(1) whether the plaintiff had a protected liberty interest in not being confined and, if so,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

(2) whether the deprivation of that liberty interest occurred without due process of law." *Tellier v. Fields,*-F.3d-, 2001 WL 457767, at *7 (2d Cir. Nov. 1, 2000) (errata filed Apr. 26, 2001) (citation omitted). After the Supreme Court's decision in *Sandin v. Connor,* 515 U.S. 472 (1995), a determination that there is a liberty interest also requires a two-part analysis. *Tellier,*-F.3d-, 2001 WL 457767, at *7. " 'As a result of *Sandin,* a prisoner has a liberty interest only if the deprivation is atypical and significant and the state has created the liberty interest by statute or regulation." ' *Id.* (citation omitted).

*Atypical and Significant Hardship*

The defendants argue that LaBounty does not have a protected liberty interest because his confinement in SHU was not atypical or significant. To determine whether the conditions of a particular confinement impose an "atypical and significant hardship" one must undertake a factual analysis. *Id.* "The circumstances that the court must examine include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions....' " *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000) (citation omitted). It is clear that "[c]onfinement in SHU may impose hardships that are atypical or significantly different from the burdens of ordinary prison confinement." *Id.* " 'The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." ' *Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (citation omitted).

Material issues of fact exist as to whether LaBounty's confinement in SHU was "atypical" as compared to the conditions of other inmates in both administrative confinement and in the general population. As noted above, LaBounty asserts that while he was in SHU, he was denied medication and medical treatment, writing materials, books, and exercise.[FN6] If proven true, these conditions would appear to be atypical when compared to the conditions of confinement not only of inmates in administrative confinement and in the general population, but also of other inmates in punitive segregation. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 304.1 *et seq.; Colon,* 215 F.3d at 230 (stating that "normal conditions of SHU confinement in New York" include one hour of exercise per day, two showers a week, and a limited number of books). LaBounty further asserts that the conditions in SHU caused him significant hardship in a number of ways, including severe physical pain and the loss of hearing.

> FN6. Although not included in the list of issues from the February 13, 2001 Order, LaBounty also presents evidence that he was allowed only two showers in one month.

**\*5** The defendants rely on the length of LaBounty's sentence of confinement for their argument that his punishment was not atypical and significant. While it has been found in at least one other case that as much as 101 days in SHU did not run afoul of *Sandin, Sims,* 230 F.3d at 23, there is no litmus test based on the length of confinement alone-as the remand here demonstrates. *See also Colon,* 215 F.3d at 232 n. 5. Even a relatively brief term in segregated confinement may violate the law. *Taylor v. Rodriguez,* 238 F.3d 188, 196 (2d Cir.2001).

The defendants have also submitted evidence regarding the percentage of inmates in disciplinary confinement. These statistics do not address the specific conditions experienced by LaBounty during his confinement in SHU. *See Welch v. Bartlett,* 196 F.3d 389, 393-94 (2d Cir.1999) (vacating summary judgment where plaintiff alleged that SHU hygiene conditions were far inferior to those in general population). "[M]erely calculating the percentage of prisoners sentenced to SHU confinement" says nothing about the qualitative experience of prisoners in confinement and the relative degree to which they are deprived of the care and facilities at issue here. *Kalwasinski v. Morse,* 201 F.3d 103, 107 (2d Cir.1999).

The defendants make several additional arguments which can swiftly be rejected. They argue that only those deprivations experienced by LaBounty that independently constitute a constitutional violation-such as deliberate indifference to his serious medical needs in violation of the Eighth Amendment or an interference with his ability to pursue litigation in violation of the First Amendment-should be considered in judging whether LaBounty suffered atypical and significant hardships.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

There is no authority within either *Sandin* or its progeny in this Circuit for such a heightened showing. The defendants also argue that the issue of whether LaBounty suffered atypical and significant hardships should be tested not by his personal experience in SHU but by what the prison regulations prescribe as the standard for treatment of SHU prisoners. They contend, for instance, that what is relevant is that SHU prisoners are supposed to receive one hour per day of out of cell exercise and either two or three showers a week (depending on the level of prison) and not that LaBounty contends he received no opportunity to exercise and two brief showers in one month. The individualized inquiry required by the law is of the actual experience of the inmate, not what the experience should have been. *Sims,* 230 F.3d at 22-23. Finally, the defendants contend that they are entitled to summary judgment because while LaBounty's description of his deprivations is sufficient to create issues of fact regarding his own experience, he has not presented evidence that inmates in general population or in administrative confinement were not subjected routinely to those same deprivations. LaBounty has, until this point in the litigation, proceeded *pro se.* He was entitled to rely on the prison's regulations, well established law, and the basic standards of decency, to make the point that the deprivations of medical care, exercise, showers, books, and writing material that he alleges he experienced for one month cannot be the general experience of inmates incarcerated in New York state.

*Liberty Interest Created by State Law*

**\*6** The defendants argue that New York State has not granted inmates a protected liberty interest in remaining free from disciplinary confinement. In *Hewitt v. Helms,* 459 U.S. 460, 471-72 (1983), the Supreme Court held that a state-created "liberty interest arises when state statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). *Sandin* did not replace *Hewitt*'s description of the process that creates a cognizable "liberty interest." *Tellier,*-F.3d-, 2001 WL 457767, at \*7; *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999); *Welch,* 196 F.3d at 394 n. 4. Where a regulation requires "in language of an unmistakably

mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates," *Tellier,*-F.3d-, 2001 WL 457767, at \*8 (citation omitted), then the regulation creates a protectable liberty interest.

New York regulates the process through which SHU disciplinary confinement may be imposed. Regulations allow such confinement only upon "[d]isposition of superintendent's Tier III hearing for a designated period of time as specified by the hearing officer." N.Y. Comp.Codes R. & Regs. tit. 7, § 301.2 (McKinney 1999). The regulations further explain the manner in which the Tier III hearings must be conducted.

> Upon receipt of a misbehavior report from the review officer, the hearing officer *shall* commence the superintendent's hearing as follows:
>
> (a) The misbehavior report *shall* be served on the inmate at least 24 hours before the superintendent's hearing. If the inmate is confined and requests an assistant, the hearing *may not* start until 24 hours after the assistant's initial meeting with the inmate.
>
> (b) The inmate *shall* be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals. The entire hearing *must* be electronically recorded.
>
> (c) The inmate when present may reply orally to the charge and/or evidence and *shall* be allowed to submit relevant documentary evidence or written statements on his behalf.

N.Y. Comp.Codes R. & Regs. tit. 7, § 254.6 (McKinney 2000) (emphasis supplied). The regulations provide that "where the hearing officer affirms the charges on the basis of the evidence, the hearing officer may impose ... confinement to a cell or room continuously or to a special housing unit continuously or on certain days during certain hours for a specified period." *Id.* § 254.7.

It has long been recognized that New York's regulations authorizing restrictive confinement in SHU "provide sufficient limitation on the discretion of prison officials to create a liberty interest." *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). *See also Sealey,* 197 F.3d at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

585 (construing New York regulation regarding administrative confinement in SHU). New York has therefore created a liberty interest protected by the Due Process Clause.

B. *Qualified Immunity*

**\*7** The defendants contend that they are entitled to qualified immunity. Qualified immunity protects a state actor sued in his individual capacity from a suit for damages. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). A state actor is qualifiedly immune if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Id.* (citation omitted).

LaBounty claims that he was deprived of his procedural due process rights during the 1995 disciplinary hearing because he was denied, among other things, the right to call witnesses and to introduce documentary evidence.[FN7] The law was clearly established in January 1995 that inmates have the right to call witnesses and submit documentary evidence at disciplinary hearings.[FN8] *Wolff v.. McDonnell,* 418 U.S. 539, 566 (1974); *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Since the contours of LaBounty's due process rights were well defined by both Supreme Court and Second Circuit precedent by the time Vuturo conducted LaBounty's disciplinary hearing in January 1995, the defendants have not demonstrated that they are entitled to qualified immunity as a matter of summary judgment.

> FN7. The parties agreed in February 2001 that the procedural irregularities at issue here were the delay in the hearing, the examination of witnesses outside of LaBounty's presence, and a prejudgment of the merits by a hearing officer. The defendants do not object to LaBounty's emphasis in this motion on the interference with his right to offer evidence.

> FN8. The defendants characterize the pertinent inquiry as whether the law was clearly established in January 1995, that inmates have a liberty interest in remaining free from SHU confinement. Defendants argue that the Second

Circuit law since *Sandin* has been "ambiguous at best." The extent to which *Sandin* may have unsettled the law on this issue is irrelevant since *Sandin* was handed down after LaBounty's hearing. The law was "clearly established" as of January 1995, that inmates have a liberty interest in remaining free from segregated confinement such as SHU. *See, e.g., Walker v. Bates,* 23 F.3d 652, 655-56 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984).

C. *Personal Involvement*

Defendants contend that they are not liable for the alleged due process violations because none of the remaining defendants was personally involved in the January 1995 disciplinary hearing. The defendants argue that hearing officer Vuturo is the only proper defendant and that no action may proceed against him because he was never served in this case. As LaBounty will be appointed counsel in this case, counsel for all parties will be able to explore this issue further.[FN9]

> FN9. The defendants argue that LaBounty failed to exhaust his administrative remedies by not filing grievances regarding the conditions in SHU. Because the defendants raised this argument for the first time in their reply brief and it has not been developed, it will not be considered. *See Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999) (holding that it would not consider arguments raised in a reply brief because "[w]e repeatedly have said that we will not consider contentions first advanced at such a late stage").

D. *Appointment of Counsel*

Plaintiff has submitted an application requesting counsel. In determining whether to grant a request for counsel, the Court must consider
the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

*Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir.1989). As a threshold matter, plaintiff must demonstrate that his claim has substance or a likelihood of success in order for the Court to grant plaintiff's request for counsel. *See Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986). Based on the Court's familiarity with this case and the legal issues presented, LaBounty's claim has substance and LaBounty has shown a need for representation. Accordingly, plaintiff's request for counsel is granted.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied. Plaintiff's request for counsel is granted. The Pro Se Office of this Court shall seek Pro Bono counsel for this plaintiff.

**8** SO ORDERED:

S.D.N.Y.,2001.

LaBounty v. Coombe
Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ramon ALVAREZ, Plaintiff,
v.
Thomas A. COUGHLIN, III, Commissioner NYS
DOCS; William Brunet, Seargent; SGT. Davis; SGT.
Emery; J. Baker, C.O.; W. Smith, C.O.; M. Hamilton,
C.O.; Mushen, C.O.; Supt. Barkley; Nurse L. Lipscum;
Thomas Farns, C.O.; Walter Lincoln, C.O., Defendants.
No. 94–CV–985(LEK)(DRH).

Feb. 6, 2001.
*MEMORANDUM–DECISION AND ORDER*

KAHN, J.

**\*1** Presently before the Court are Plaintiff's motions for relief from judgment and for recusal of the undersigned. For the reasons set forth below, Plaintiff's motions are denied.

### I. BACKGROUND

Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), commenced the present 42 U.S.C. § 1983 action alleging violations of his Constitutional Rights on August 5, 1994. On July 18, 1993, while Plaintiff was incarcerated at Riverview Correctional Facility, defendant Baker alleges that she witnessed Plaintiff exposing himself to her in the recreation yard. Plaintiff was then taken from the yard to the infirmary by defendants Baker, Smith, and Hamilton. In his Amended Complaint, Defendant alleges, in relevant part, that he was repeatedly assaulted by defendants Davis, Smith, Mushen, and Hamilton while defendants Liscum, Baker, and Emery stood by and watched in violation of his Eighth Amendment rights. Plaintiff then alleges that he was escorted to the prison's special housing unit ("S.H.U.") and received further physical mistreatment from defendants Emery, Mushen, Hamilton, Smith, Farns, and Lincoln.

Plaintiff also alleges that his due process rights under the Fourteenth Amendment were violated by the disciplinary proceeding resulting from the incident, which was conducted by defendant Brunet. Finally, Plaintiff alleges that defendant Barkley participated in the violation of these rights by failing to address Plaintiff's grievances and by designating a biased hearing officer, defendant Brunet, to preside over Plaintiff's Tier III hearing.

On June 14, 1999, defendants Brunet, Baker and Barkley ("Defendants") filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff filed an affirmation in opposition to Defendants' motion on June 23, 1999 and a letter response on July 6, 1999. By an Order dated October 25, 1999, this Court granted Defendants' motion for summary judgment and dismissed Plaintiff's case against them in its entirety. [FN1] Plaintiff's current motions for relief from judgment and recusal were filed on November 12, 1999 and March 23, 1999, respectively.

> FN1. Also still pending before the Court is a motion for summary judgment filed by Plaintiff September 1, 1998. The motion was originally dismissed by the Court's Order adopting the Report–Recommendation of United States Magistrate Judge David R. Homer, which held that the motion was untimely and, in the alternative, that it failed on the merits. Then, by an Order dated June 1, 1999, the Court vacated its previous order and held that Plaintiff's motion would be addressed on the merits, along with Defendants' motion for summary judgment. However, Judge Homer's Report–Recommendation did address the merits of Plaintiff's motion. The Court has undertaken a de novo review of the record and has determined that Plaintiff's motion should be dismissed for the reasons discussed in the Report–Recommendation.

### II. ANALYSIS

A. Relief from Judgment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Plaintiff's motion, although termed a "motion for relief from judgment," is brought pursuant to Local Rule 7.1(g). Accordingly, it will be treated by the Court as a motion for reconsideration.

Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g), unless otherwise governed by Fed.R.Civ.P. 60. The "clearly erroneous" standard of review applies to motions for reconsideration. The moving party must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).

Generally, the prevailing rule in the Northern District "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C–TC 9th Ave. P'ship,* 182 B.R. 1, 3 (N.D.N.Y.1995). Defendant does not argue that there has been an intervening change in controlling law or the availability of new evidence. Therefore, the basis for this motion must be that the Court made a clear error of law or needs to correct a manifest injustice. Although this Court enjoys broad discretion when making a determination to reconsider on this ground, *Von Ritter v. Heald,* 876 F.Supp. 18, 19 (N.D.N.Y.1995), it will not disregard the law of the prior case unless "the Court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981).

1. *Discovery Matters*

**\*2** Plaintiff, in part, objected to Defendants' motion for summary judgment on the ground that Defendants have yet to comply with several orders by this Court compelling production. Ordinarily, Defendants' failure to comply with discovery orders would make a motion for summary judgment premature. However, in this case, the outstanding items sought by Plaintiff do not relate to the claims against the three defendants who have brought the present action.

Plaintiff points to two orders compelling Defendants to comply with his discovery requests. The first, signed on June 26, 1997, orders Defendants to provide Plaintiff with: (1) the names, identification numbers, and cell locations of all inmates that were confined in the Special Housing Unit the evening of the event; (2) copies of any witness refusal forms; (3) copies of Plaintiff's medical records from July 18, 1993 to September 27, 1993; (4) copies of medical refusal forms indicating that Plaintiff refused his medication on the day of the incident; (5) copies of any reports prepared by prison staff regarding Plaintiff's refusal to take his medication between July 18, 1993 and September 27, 1993; and (6) copies of psychiatric reports regarding Plaintiff dated July 18, 1993 to September 27, 1993. The second order, signed on January 29, 1998, requires Defendants to provide Plaintiff with clearer copies of photographs taken of Plaintiff on the day of the incident.

To the extent any of these items exist, they are not relevant to the summary judgment motion before the Court. Accordingly, the Court is free to address the summary judgment motion of these three defendants. However, if Defendants still have not produced the complained of documents and photographs, Plaintiff is free to file another motion to compel or a motion for sanctions.

2. *Defendant Baker*

In their motion for summary judgment, Defendants argue that Plaintiff's claims against defendant Baker are conclusory and insufficient because they do not contain specific allegations of fact indicating a deprivation of rights. *See Barr v. Abrams,* 912 F.2d 52, 56 (2d Cir.1986). Plaintiff's Amended Complaint makes mention of defendant Baker only once. Plaintiff's first cause of action alleges that:

[t]he willful acts and omissions of defendant J. Baker constituted gross deprivation of the plaintiff's Civil Rights when J. Baker subject[ed] or caused plaintiff to be subjected to cruel and unusual punishment and failed to intervene to secure the plaintiff's health and safety.

However, Plaintiff's statement of facts does not allege that defendant Baker was present at the time of the beating

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

or that Baker had any knowledge whatsoever of the beating.

In fact, Plaintiff's statement of facts does not mention defendant Baker at all. The statement of facts does, on the other hand, describe with specificity the involvement of a number of prison staff members, including defendant Liscum who allegedly observed the assault without taking any action to intervene, suggesting that Baker was not present at the time of the beating. Accordingly, Plaintiff's claims against defendant Baker do not contain any specific allegations of fact regarding her alleged failure to intervene and this Court was not in error when it dismissed them.

### 3. *Defendant Barkley*

**\*3** Defendants argue that Plaintiff has not alleged sufficient personal involvement on the part of defendant Barkley. In order to maintain a Section 1983 action, a plaintiff must allege direct personal involvement by the defendant in the alleged constitutional deprivation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (1994). Liability may not be based on respondeat superior or vicarious liability. *See Al– Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisors may be held liable for personal involvement when they: (1) are directly involved in the alleged events; (2) fail to rectify a constitutional violation after being notified of the situation; (3) create or allow to continue a policy of unconstitutional practices; or (4) commit gross negligence in supervising the individuals responsible for the constitutional violations. *See Wright,* 21 F.3d at 501.

Here, Plaintiff's complaint baldly alleges that defendant Barkley failed to address Plaintiff's grievance complaint and appointed a biased hearing officer to conduct Plaintiff's disciplinary hearing. Plaintiff does not make any specific factual allegations regarding defendant Barkley's involvement in his case. Plaintiff's statement of facts fails to allege facts establishing that Barkley ever reviewed his grievance. Indeed, Plaintiff's own exhibit reveals that Harlan W. Jarvis, Jr., Acting Superintendent, rather than defendant Barkley, reviewed Plaintiff's

grievance. Moreover, an exhibit introduced by Defendants, and not contradicted by Plaintiff, shows that Mr. Jarvis also appointed the hearing officer for Plaintiff's disciplinary hearing.

"It is not enough to allege that officials failed to carry out the duties of their office without defining these duties or how each individual failed to meet them." *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at *5– *6 (S.D.N.Y. July 13, 1998) (citing *Beaman v. Coombe,* No. 96 Civ. 3622, 1997 WL 538833, at *3 (S.D.N.Y. Aug. 29, 1997), *aff'd in relevant part* No. 97–2683, 1998 WL 382751, at **1 (2d Cir. May 13, 1998)). Because Plaintiff's claim against defendant Barkley fails to allege with sufficient specificity his personal involvement in the alleged constitutional violations, it was properly dismissed by the Court.

### 4. *Defendant Brunet*

Plaintiff alleges that defendant Brunet violated his Due Process rights under the Fourteenth Amendment in the conduct of his disciplinary hearing. Defendants argue that (1) Plaintiff's claim is barred by the Supreme Court decision in *Sandin v. Conner,* 515 U.S. 472 (1995), because Plaintiff has not alleged that he had a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process due under *Wolff v. McDowell,* 418 U.S. 539 (1974); and (3) defendant Brunet is protected by qualified immunity in any event.[FN2] In order to establish a due process violation, a defendant must "prove that the state has created a protected liberty interest and that the process due was denied." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

> FN2. Defendants also argue in their brief that Plaintiff's claim is barred by the Supreme Court decisions in *Heck v. Humphrey,* 512 U .S. 477 (1994), and *Edwards v. Balisok,* 520 U.S. 641 (1997). Following the filing of Defendants' brief, however, the Second Circuit held that a Section 1983 suit "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards." Jenkins v. Haubert,* 179 F.3d 19, 27

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

(2d Cir.1999). Because Plaintiff's complaint challenges the conditions of, as opposed to the fact or duration of his confinement, the *Heck* and *Edwards* decisions are not applicable.

a. *Protected liberty interest*

**\*4** In *Sandin,* the Supreme Court considered whether prisoners have a protected liberty interest entitling them to due process in disciplinary proceedings and held that such interests "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Sandin,* 515 U.S. at 483–84. Following the *Sandin* decision, the Second Circuit held that, in order for a liberty interest to be protectable, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

    i. Atypical and significant hardship

The Second Circuit has repeatedly held that, in determining whether a liberty interest has been affected, a district court is required to undertake extensive fact-finding regarding both the length and conditions of confinement and make specific findings in support of its conclusions. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *Sealey v. Giltner,* 116 F.3d 47, 51–52 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). The Second Circuit makes clear that it is not enough to look at the length of time a prisoner has been confined to SHU in determining whether he has a liberty interest. *Brooks,* 112 F.3d at 49. Instead, courts must also make a factual finding as to the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population. *Id.* (citing *Miller,* 111 F.3d at 8–9).

However, in *Hynes v. Squillance,* 143 F.3d 653 (2d Cir.1998), the Second Circuit held that, "in cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation

of its reasoning." *Id.* at 658. There, the plaintiff offered no evidence in support of his argument that his 21–day confinement was atypical or significant to contradict the defendants' submission showing that the conditions of confinement were typical. *See id.* The ruling was explicitly limited, however, to cases involving shorter periods of segregated confinement. *See id.* The Court held that the decisions in *Miller, Brooks,* and *Wright* all required specific factual findings because they "involved relatively long periods of confinement." *Id.; see also Spaight v. Cichon,* No. 98–2537, 1998 WL 852553, at *2 (2d Cir. Dec 8, 1998) (holding that a 39–day confinement was not so short as to be subject to dismissal under *Hynes* without further analysis); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (advising district courts to develop a detailed factual record for cases involving segregated confinement of between 101 and 305 days in lenght). The plaintiff in *Miller,* for example, was subject to disciplinary segregation for 125 days. *See Miller,* 11 F.3d at 7.

**\*5** In this case, Plaintiff was subject to 120 days in disciplinary segregation, much closer to the period of confinement in *Miller* than that in *Hynes.* Accordingly, the Court may not rely on the length of Plaintiff's confinement alone and must undertake a detailed factual finding regarding the conditions of Plaintiff's confinement as compared to other forms of segregated confinement and to the general population of inmates.

To establish that Plaintiff's confinement was not atypical and significant, Defendants put forth the affidavit of Mr. Donald Selsky, Director of the Special Housing/Inmate Disciplinary Program. However, Selsky's affidavit discusses the special housing program on a statewide basis in comparison to general population policies statewide, but acknowledges that conditions differ from facility to facility. The affidavit also includes a variety of statistics regarding SHU confinement establish, including the fact that 19,983 of the 215,701 inmates (9.26%) in the prison system between 1991 and 1996 were penalized with SHU confinement and that 17,302 of those received terms up to one year (85.17%). It does not, however, provide any evidence regarding the specific conditions of Plaintiff's confinement.

This leaves the Court with insufficient evidence with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

which to compare Plaintiff's conditions of confinement to other forms of segregated confinement and to the general population. If such a generalized showing by the government regarding the typicality of segregated confinement was satisfactory, then there would be no need for the specific factual findings required in each case by the Second Circuit.

Indeed, in *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1994), the Second Circuit held that a district court's reliance on the percentage of the prison population receiving punitive terms of segregated confinement and the percentage of that group receiving terms similar in length to that of the plaintiff was inappropriate. *See id.* at 394. The Court held that

> [t]he theory of *Sandin* is that, notwithstanding a mandatory entitlement, a deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration.

> *Id.*

A comparison between the duration of a plaintiff's SHU confinement and the SHU terms received by other inmates who were convicted of misbehavior "does not tell whether [the plaintiff's] deprivation was more serious than typically endured by prisoners as an ordinary incident of prison life." *Id.* Likewise, the court held that punitive terms in SHU

> are not a 'normal incident' for a prisoner whose wrongdoing must be established according to due process standards if the consequence of an adverse finding is confinement in atypical conditions of severe hardship. How many prisoners receive such terms as punishment for misbehavior does not measure how likely a prisoner is to suffer comparable deprivation in the ordinary administration of the prison.

**\*6** *Id.* Moreover, the Court expressed doubt that, even if such a statistic was held to be relevant, the fact that 10% of prisoner were subject to terms in SHU made such

confinement typical. *See id.* at 394 n.2.

As the record before the Court is not sufficient to determine whether Plaintiff's confinement was an atypical and significant hardship, summary judgment at this time is inappropriate.

### ii. State created liberty interest

Defendants also argue the second prong of the *Frazier* test, requiring Plaintiff to establish the existence of a state-created liberty interest in remaining free from segregated confinement, has not been satisfied. Defendants contend that no New York law grants prisoners the right to be free from segregated confinement.

Defendants argue that previous Second Circuit precedent establishing the existence of such a state-created interest, *see, e.g., Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984), does not survive the Supreme Court's decision in *Sandin.* However, *Sandin* does not effect the validity of these decisions. *See Ramirez v. McGinnis,* 75 F.Supp.2d 147, 153 (S.D.N.Y.1999) (holding that *Sandin* "simply limits due process protection to hardships that are also 'atypical and significant' ") (citing *Gonzalez v. Coughlin,* 969 F.Supp. 256, 257 (S.D.N.Y.1997); *Wright v. Miller,* 973 F.Supp. 390, 395 (S.D.N.Y.1997); *Lee v. Coughlin,* 26 F.Supp.2d 615, 632–33 (S.D.N.Y.1998)). Accordingly, New York State regulations do create a protected liberty interest in remaining free from disciplinary segregation.

### b. *Process Due*

Defendants next urge the Court to find that, even if Plaintiff was entitled to due process protections, he was afforded the necessary procedural protections at his hearing. In a conclusory fashion, Defendants argue that Plaintiff "received advance notice of the charges, called witnesses at the hearing, and testified on his own behalf."

When charged with a disciplinary infraction that could lead to loss of good-time credits or to confinement in SHU, a prisoner is entitled to "at least the minimum requirements of procedural due process appropriate for the circumstances." *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *see Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983)). This requires, among things, that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

prisoner be given advance notice of the charges against him and a meaningful opportunity to marshall and present evidence in his defense, which includes the right to "call witnesses and present evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 563, 566.

Plaintiff specifically argues that defendant Brunet denied him due process by, among other things, disregarding his complaints regarding the confiscation of his trial materials and refusing to allow him to present an eye witness who would testify that Plaintiff was beaten by several of the defendants. The requirement that a prisoner be given advance notice of the charges against him is "no mere formality." *Benitez,* 985 F.2d at 665. Such "notice must be 'written ... in order to inform [the inmate] of the charges and to enable him to marshall the facts and prepare a defense." ' *Id.* (quoting *Wolff,* 418 U.S. at 564). Moreover, the prisoner must be given the notice no less than 24 hours before the hearing and be permitted to retain the notice for at least 24 hours. *See Benitez,* 985 F.2d at 665–66.

**\*7** Here, Plaintiff alleges that his litigation papers were all confiscated from him by the guards in the SHU and that, when he complained of these actions to defendant Brunet, his concerns were ignored. Confiscation of a prisoner's papers made in preparation for a hearing, particularly the notice of charges, significantly hampers the prisoner's ability to prepare his defense. Defendants do not address Plaintiff's allegation in their papers. Accordingly, summary judgment is not appropriate on this ground.

A prisoner is also given the right to call and present witnesses in his defense at a disciplinary hearing. *See Ponte v. Real,* 471 U.S. 491, 495 (1985) (citing *Wolff,* 418 U.S. at 566)). This right is not absolute, however, as prison officials must be allowed "discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority." *Wolff,* 418 U.S. at 566; *see also Ponte,* 471 U.S. at 496 (suggesting that prison officials may also deny a witness request on grounds of irrelevance or lack of necessity). However, "a hearing official has a duty to

articulate an explanation for the decision to exclude a witness." *Rivera v. Coughlin,* No. 92 Civ. 3404, 1994 WL 263417, at \*6 (S.D.N.Y. June 13, 1994).

In this case, Plaintiff alleges that he requested the presence of an eye-witness to the events in question but that defendant Brunet did not allow it. The transcript to the hearing reveals that Brunet informed Plaintiff that he could not contact the witness because he could not contact the witness and the hearing had to be finished that day.

Defendants have not argued, much less established, that these were reasonable limits placed on the hearing by Brunet. Moreover, Defendants have not presented any evidence or argued that allowing the witness' testimony would have been "unduly hazardous to institutional safety" or create a "risk of reprisal or undermine authority." Defendants do not even argue the validity or importance of those reasons set forth by defendant Brunet at the hearing. Finally, it is clear that the proposed evidence in this case was not irrelevant or unnecessary. Accordingly, genuine issues of material fact exist which prevent a finding of summary judgment at this time.

c. *Qualified Immunity*

Finally, relying solely on their prior arguments, Defendants contend that defendant Brunet is protected by qualified immunity. The doctrine of qualified immunity protects a Section 1983 defendant from liability for damages if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Defendants are further protected from liability where the rights are clearly established if it was objectively reasonable to believe that their actions did not violate those rights. *See Anderson v. Creighton,* 483 U.S. 635, 638 (1987).

**\*8** The officials do not have such immunity, however, where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. In determining whether a particular right was clearly established at the time of the alleged violation, courts should consider:

(1) whether the right in question was defined with

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

"reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

In this case, Plaintiff's right to notice and to present witnesses were clearly established and well defined at the time of the hearing, July 22, 1993. Although, prior to 1993, it was not entirely clear whether a prisoner was entitled to keep his notice for at least 24 hours, *Benitez* clarified that this was so on February 3, 1993. Therefore, it was not objectively reasonable for defendant Brunet to leave unanswered Plaintiff's complaint that his litigation papers were confiscated.

Also, the right to present witnesses at a disciplinary hearing and the limitations on that right were well defined prior to the time of the hearing. Whether the rationale offered by defendant Brunet for excluding the witness, the difficulty in locating the witness and the need to complete the hearing that day, are sufficient justification to support his qualified immunity defense are material issues of fact which cannot be resolved on a motion for summary judgment. *See Rivera,* 1994 WL 263417, at *6. Accordingly, summary judgment may not be granted on this ground.

In light of these holdings, it is evident that this Court made a clear error of law and that reconsideration is appropriate as to Plaintiff's claims against defendant Brunet.

B. Recusal

Plaintiff's motion for recusal is based on 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* Importantly, it does not matter whether the judge is in fact subjectively impartial, only whether the objective facts create the appearance of impartiality. *United States v. Bayless,* 201 F.3d 116, 126 (2d Cir.2000);

*Hughes v. City of Albany,* No. 98–2665, 1999 WL 709290, at **2 (2d Cir. July 1, 1999). "The ultimate inquiry is whether 'a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned." ' *Hughes v. City of Albany,* 33 F.Supp.2d 152, 153 (N.D.N.Y.1999) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)); *see Bayless,* 201 F.3d at 126.

In this case, Plaintiff's claim is based on the congregation of a number of the Court's rulings and the overall handling of his case. The Supreme Court has held, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994); *see Hughes,* 1999 WL 709290, at **2. Indeed, the Second Circuit has held that "opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has a 'deep-seated favoritism or antagonism that would make fair judgment impossible." ' *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999) (quoting *Liteky,* 510 U.S. at 555). Plaintiff has put forth nothing, and a review of the record reveals nothing, which would suggest to an objective observer that the Court has a deep-seated favoritism for Defendants or any antagonism against Plaintiff. Therefore, his motion is denied.

III. CONCLUSION

**9** ORDERED that Plaintiff's motion to vacate is GRANTED in part and DENIED in part consistent with the terms of this opinion;

ORDERED that Plaintiff's claim against defendant Brunet be REINSTATED and the judgment dismissing the case in defendant Brunet's favor be VACATED;

ORDERED that Plaintiff's motion for recusal is DENIED; and it is further

ORDERED that the clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,2001.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Alvarez v. Coughlin
Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.

Eric JOHNSON, also known as Debah J. Smith,
Plaintiff,

v.

Ayisha ENU, Physician, Hudson Correctional Facility;
Peter Bogarski; Reuteneaur, Jane Doe; McCoy, John
Doe; H.M. Miles; Joyce Duke; Wolff, John Doe;
Rother, Jane Doe; George, John Doe; Testo, John Doe;
Peter Behrle; M. Graziano; Michael Ambrosino; Philip
Heath; T. Mahar, Senior Correction Counselor, Greene
Correctional Facility; T. Gaines; Caulfield, John Doe;
John Doe # 1; John Doe # 2; Karen Meicht, Nurse,
Hudson Correctional Facility; Winnie, Lieutenant,
Hudson Correctional Facility; and Coffey, John Doe,
Defendants.[FN1]

> **FN1.** Ankesh Nigam and John Rodgers were also
> named as defendants in the amended complaint.
> Dkt. No. 64. On September 18, 2010, their
> motion for summary judgment was granted. Dkt.
> No. 115. Further, John Doe George was named
> as a defendant in the original complaint (Dkt.
> No. 1) but he was not named as a defendant in
> the amended complaint (Dkt. No. 64). The
> amended complaint also fails to allege that
> George engaged in any of the alleged
> unconstitutional conduct. Accordingly, the Clerk
> is directed to terminate him as a party to this
> action.

No. 08–CV–158 (FJS/DRH).

July 13, 2011.

Eric Johnson, c/o Debah J. Smith, Brooklyn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Dean J. Higgins, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER**[FN2]

> **FN2.** This matter was referred to the undersigned
> for report and recommendation pursuant to 28

U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff *pro se* Eric Johnson ("Johnson"), formerly
an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), brings
this action pursuant to 42 U.S.C. §§ 1983 and 1985
alleging that defendants, twenty-one DOCS employees,
violated his constitutional rights. Am. Compl. (Dkt. No.
64). Presently pending is defendants' motion for summary
judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 119.
Johnson has not opposed this motion. For the following
reasons, it is recommended that defendants' motion be
granted in its entirety.

**I. Failure to Respond**

Johnson did not oppose defendants' motion.
"Summary judgment should not be entered by default
against a pro se plaintiff who has not been given any
notice that failure to respond will be deemed a default."
*Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).
Defendants and the Court provided such notice here. Dkt.
Nos. 119–14, 120. Despite this notice, Johnson failed to
respond. "The fact that there has been no response to a
summary judgment motion does not ... mean that the
motion is to be granted automatically ." *Champion,* 76
F.3d at 436. Even in the absence of a response, a
defendant is entitled to summary judgment only if the
material facts demonstrate his or her entitlement to
judgment as a matter of law. *Id.;* Fed.R.Civ.P. 56(c).

Because Johnson has not responded to raise any
question of material fact, the facts-but not the legal
conclusions-set forth in defendants' Rule 7.1 Statement of
Material Facts (Dkt. No. 119–1) [hereinafter "Defs.' 7.1
Statement"] are accepted as true. *See, e.g., Onanuga v.
Pfizer, Inc.,* 369 F.Supp.2d 491, 493 n. 1 (S.D.N.Y.2005)
(citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 72
(2d Cir.2001); *Lopez v. Reynolds,* 998 F.Supp. 252, 256
(W.D.N.Y.1997); *see also* N.D.N.Y.L.R. 7.1(a)(3) (*"The
Court shall deem admitted any facts set forth in the
Statement of Material Facts that the opposing party does
not specifically controvert."* ) (emphasis in original).

Finally, as to those facts not contained in defendants'
7.1 statement, the Court will assume for purposes of this

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998). To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based on "personal knowledge." Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). While the amended complaint is not notarized as was the original complaint (Dkt. No. 1), the amended complaint contains a statement above Johnson's signature stating, "I declare under penalty that the foregoing is true and correct." Am. Compl. at 31; Compl. at 21. Both verifications suffice to require that these documents be considered in opposition to the pending motion as long as the other requirements of Rule 56(c)(4) are satisfied, including personal knowledge, admissibility, and competency. *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

## II. Background

**\*2** In February 2005, while housed at Ulster Correctional Facility, Johnson was diagnosed with Hepatitis B. Defs.' 7.1. Statement ¶ 18. He was transferred to Hudson Correctional Facility ("Hudson") on March 15, 2006. *Id.* ¶ 19. Dr. Ayisha Enu, a defendant herein, reviewed Johnson's medical records upon his arrival at Hudson. *Id.* ¶ 22. On March 22, Hudson medical staff performed additional blood tests. *Id.* ¶ 24. Five days later, on March 27, Johnson informed Dr. Enu of his hepatitis diagnosis. *Id.* ¶ 23.
Dr. Enu received the results from Johnson's blood tests on September 1. *Id.* ¶ 25. The tests revealed that Johnson was HbeAg negative and anti-HBe positive, indicating that he had a variant of Hepatitis B and likely had it "for a very long time.". *Id.* ¶¶ 26–27. Dr. Enu then ordered liver function tests and counseled Johnson on the disease and treatment options. *Id.* ¶ 28. Johnson's liver function and Hepatitis B viral load tests were drawn on August 30. *Id.* ¶ 29. Those tests revealed elevated liver enzyme levels as compared to tests conducted earlier in

the year. *Id.* ¶ 30. Dr. Enu and Johnson discussed the results on September 5. *Id.* ¶ 31. Johnson stated that he did not believe the results because his liver function tests were always normal. *Id.* Dr. Enu then ordered a repeat of the liver function and Hepatitis B viral load tests. *Id.* ¶ 32.

On September 11, 2006, the results from the Hepatitis viral load drawn on August 30, 2006, "revealed a very high [viral load] count." Defs.' 7.1 Statement ¶ 33. Four days later, on September 15, Dr. Enu made arrangements for Johnson to see Dr. Rodgers, a gastroenterology specialist at Albany Medical Center Hospital, to discuss Hepatitis treatment. *Id.* ¶ 34. Samples for liver function and Hepatitis B tests were drawn again on September 20, 2006. *Id.* ¶ 35. Those tests, once again, revealed elevated enzyme levels. *Id.* Dr. Enu saw Johnson again on October 26. *Id.* ¶ 36. Dr. Enu ordered Hepsera for Johnson, and they discussed the blood and liver function testing regiment that Johnson would undergo once he started treatment. *Id.*

After starting treatment on October 26, Johnson researched Hepsera and learned of the complications that could develop if he were to ever stop taking the drug. Am. Compl. at 9; *see also* Defs.' Ex. B (Dkt. No. 119–4) at 263. Johnson returned to medical staff on November 3, 2006, because he had questions about the medication. Defs.' 7.1 Statement ¶ 37. Dr. Smith, who was covering for Dr. Enu, explained to Johnson the need for follow up and compliance because Hepatitis B is a chronic disease and that his liver function tests showed abnormal enzyme levels. *Id.* Johnson returned to the medical department on November 16 because he was concerned about Hepsera's side effects. Am. Compl. at 9; *see also* Defs.' Ex. B at 258. Nurse Peter Bogarski, a defendant herein, allegedly ignored Johnson's questions and asked that he be removed from the examination room. *Id.*

**\*3** Johnson requested permission from his instructor to file a grievance after returning to his work assignment. Am. Compl. at 9. He went to the library to file a grievance directly with Grievance Officer T. Testo, a defendant herein, but Testo was not present. *Id.* at 9–10. Johnson took a grievance form and attempted to return to his assignment but he was stopped by Correction Officer Rother, also a defendant herein. *Id.* at 10. Rother

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

conducted a pat and frisk of Johnson and told him that he could not file a grievance in there and to return to his assignment. *Id.* Correction Sergeant John Doe Wolfe, [FN3] another defendant herein, escorted Johnson back to his assignment. *Id.* Wolfe then questioned Instructor Deer about Johnson's "movement." *Id.* Deer stated that he assumed that Johnson was returning to the medical unit. *Id.* Johnson received a misbehavior report. *Id.*

> FN3. Defendant Wolfe's name is incorrectly spelled in the amended complaint. *See* Dkt. No. 64. The correct spelling is Wolfe. *See* Defs.' Answer to Am. Compl. (Dkt. No. 79) ¶ 2.

A CT scan was performed on Johnson at Albany Medical Center Hospital on November 25, 2006. Defs.' 7.1 Statement ¶ 38. On November 28, Dr. Enu learned that the scan revealed a mass on the tail of Johnson's pancreas. *Id.* ¶ 39. Johnson had an MRI on December 18. *Id.* ¶ 40. Consistent with the results of the earlier CT scan, the MRI also showed a mass on the tail of Johnson's pancreas. *Id.* ¶ 44. The differential diagnosis of the MRI "include[d] islet cell tumor, metatastic disease, or carcinoid." *Id.* ¶ 45; *see also* Defs.' Ex. B at 150.

Nurse Karen Meicht, a defendant herein, examined Johnson on December 13, 2006, after Johnson complained of stomach problems. Am. Compl. at 11; *see also* Defs.' Ex. B at 256. Johnson asked when he would see Dr. Rodgers again. Am. Compl. at 11. Meicht told Johnson that he would have to wait until the test results were ready for review. *Id.; see also* Defs.' Ex. B at 256. Johnson then received some stomach fiber and left the medical department. Am. Compl. at 11.

Dr. Enu referred Johnson to Dr. Nigam, a surgeon at Albany Medical College, for a consultation. Defs.' 7.1 Statement ¶ 46. Dr. Nigam's first examined Johnson on January 5, 2007, and Johnson agreed to remove the mass on the pancreas surgically. Nigam Aff. (Dkt. No. 94–2) ¶¶ 9–10. Four days later, Johnson claims to have written a letter to Bogarski, "requesting further clarity on the proposed surgery." Am. Compl. at 9. On January 30, 2007, the day of the scheduled surgery, Johnson expressed his reluctance to proceed with the surgery and wanted more information on other options, including waiting or a

biopsy. Nigam Aff. ¶ 11. Dr. Nigam warned Johnson that there was a "small risk" that the mass could develop into cancer by waiting. *Id.* Johnson decided not to have the surgery, and on April 5, 2007, Dr. Nigam wrote an order for a biopsy of the pancreas with Dr. Sood. *Id.* ¶ 12; Defs.' 7.1 Statement ¶ 49.

Johnson met with defendants Enu, Bogarski, Meicht and Nurse Jane Doe Reutenaur [FN4] on February 2, 2007, to discuss follow-up surgical treatment. Am. Compl. at 14; *see also* Defs.' Ex. B at 88. Johnson claims that Enu acted as if the surgery were an elective procedure and focused on the mass on the chest instead of the mass on the pancreas. Am. Compl. at 14. Reuteneaur allegedly told Johnson that there was nothing that medical staff could do because Johnson refused the surgery. *Id.* Following this meeting, Hudson Deputy Superintendent for Security H.M. Miles, a defendant herein, allegedly removed Johnson from the outside community work crew, "implying" that Johnson had caused a disturbance. Am. Compl. at 14.

> FN4. Both the original complaint and the amended complaint name "Jane Doe Reutenaur" as a defendant. Johnson believes that this defendant is female. *See* Am. Compl. at 5, 18. Terry Reuteneaur accepted service of the original complaint. *See* Dkt. No. 49. In support of the present motion, Terry Reuteneaur submitted an affidavit stating that he is male and that the allegations made against Jane Doe Reuteneaur do not refer to him. Reutenaur Decl. (Dkt. No. 119–12) ¶¶ 4–5. Even if the pleadings were served on the incorrect person, no further identification or service upon Jane Doe Reuteneaur is necessary because doing so would be futile as Johnson has failed to state a claim against Jane Doe Reuteneaur. *See* discussion *infra* Point III(D)(4).

**\*4** On March 1, 2007, Johnson was brought to the medical building after complaining of a "spinning headache." Defs.' 7.1 Statement ¶ 61; Am. Compl. at 15. Dr. Enu recommended that Johnson be evaluated at Columbia Memorial Hospital because the Hudson emergency medical staff leaves at 10:00PM, and Johnson's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

"new symptom" might require emergency medical staff. Defs.' 7.1 Statement ¶¶ 62–64. Johnson refused to go to the private hospital. *Id.* ¶ 66. Johnson was then sent to Coxsackie Correctional Facility's Regional Medical Unit ("Coxsackie RMU") for observation. *Id.* ¶ 68. Before returning to Hudson on the next day, Coxsackie RMU medical staff allegedly told Johnson that there was no reason for the transfer. Am. Compl. at 16.

Upon Johnson's return to Hudson on March 2, Meicht issued Johnson a misbehavior report, accusing Johnson of lying, providing false information, and failing to report an illness. Am. Compl. at 16; *see also* Defs.' Ex. D (Dkt. No. 119–6) at 4. Correction Lieutenant Winnie, a defendant herein, found Johnson guilty. Defs.' Ex. D at 1. Johnson received thirty-days in keeplock, and he had recreation, package, commissary, and phone privileges suspended for fifteen days. *Id.*

Johnson learned on March 15, 2007, that Dr. Enu requested a change in Johnson's medical level so that he could be transferred. *Id.* at 17. Johnson claims that the real reason for the transfer was because he was "argumentative and problematic." *Id.* Johnson also wrote to Bogarski on March 15 to request a "reevaluation of the canceled pancreatic surgery." Am. Compl. at 17. Johnson did not receive a response. *Id.*

Johnson was transferred to Greene Correctional Facility ("Greene") on March 21, 2007. Defs.' 7.1 Statement ¶ 52. Upon arriving at Greene, Johnson wrote to Greene Superintendent Peter Behrle, a defendant herein, requesting information on the transfer. Am. Compl. at 18. Greene Deputy Superintendent for Security M. Graziona, also a defendant herein, responded on April 2, 2007, and told Johnson that he was transferred for unspecified medical reasons and that he would return to Hudson once his medical needs were met. *Id.* Also on April 2, Johnson spoke with Physician John Doe Caulfield, another defendant herein, about the reason for the transfer and biopsy. *Id.* Johnson claims that Caulfield "made it appear as if [Johnson] were requesting the needle biopsy as an elective procedure," and that it took Caulfield two months to order the biopsy despite the "urgency of [the] condition." *Id.*

Graziano allegedly wrote to Johnson on June 17, 2007, to inform Johnson that his medical condition was changed, permitting him to transfer out of Greene. Am. Compl. at 19. Three days later, Johnson claims to have received a letter from Correction Counselor T. Gaines, a defendant herein, stating that Johnson's transfer was awaiting approval from the central office in Albany. *Id.*

**\*5** On June 6, 2007, while at Greene and under the care of Dr. Sood, Johnson underwent an upper endoscopy ultrasound in an attempt to biopsy the pancreatic mass. Defs.' 7.1 Statement ¶¶ 50–51. The pancreatic mass, however, could not be visualized. *Id.* ¶ 51. On September 7, 2007, under the care of Dr. Doreen Smith at Greene, Johnson had a CT scan. *Id.* ¶ 53. This scan showed a stable pancreatic tail mass that had been stable for at least ten months. *Id.* ¶ 53. Johnson also received a letter on September 7 from Behrle, stating that the transfer back to Hudson was now permissible. Am. Compl. at 19. But two weeks later, on September 21, Johnson received a letter from Gaines, stating that the central office denied the transfer as Greene was the proper facility because of Johnson's medical condition. *Id.* at 20. Greene Deputy Superintendent Michael Ambrosino, also a defendant herein, allegedly sent Johnson a letter on September 24 to inform him that his "medical level" was changed due to a hold placed on Johnson by the parole board on March 15, 2007. *Id.*

While at Greene, Johnson filed two grievances on September 22, 2007. Am. Compl. at 23. One grievance was about the failure to honor his request to speak with Caulfield. *Id.* The other was related to the circumstances of Johnson's transfer to Greene in March 2007. *Id.* Johnson was allegedly told that transfers were not grievable and that the grievance would not be filed. *Id.* Johnson alleges that it was Defendants John Doe # 1 [FN5] and John Doe # 2 who refused to file these grievances. *Id.* On October 3, 2007, Senior Correction Counselor Tim Mahar, another defendant herein, wrote to Johnson to inform him that an "unscheduled transfer [has] been submitted." Am. Compl. at 20. Johnson received a letter on October 16 from Greene Deputy Superintendent for Programs Philip Heath, also a defendant herein, stating that Johnson was "to remain at Greene." *Id.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

FN5. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b) (service of process must be made within sixty days of the filing of the complaint). Because these defendants have not been identified by Johnson or served with process, it is recommended that the complaint be dismissed without prejudice as to John Doe # 1 and John Doe # 2. No further identification or service upon John Doe # 1 or John Doe # 2 are necessary because doing so would be futile as Johnson has failed to state a claim against these defendants. *See* discussion *infra* Point III(F).

Johnson returned to Hudson on February 2, 2008. Defs.' 7.1 Statement ¶ 56. Dr. Enu continued to work with Johnson in conjunction with Dr. Nigam and Dr. Rodgers.[FN6] *Id.* ¶ 52. Dr. Enu saw Johnson on March 28 and April 9, 2008, to discuss the elevated tumor markers. *Id.* ¶ 57. A CT of the liver was scheduled to be performed on May 12, 2008, because of an elevated tumor marker located next to the Hepatic Vein. *Id.* ¶ 58. Johnson, however, refused the procedure until he had an opportunity to discuss it with his family. *Id.*

FN6. A detailed discussion of Dr. Nigam's and Dr. Rodgers's involvement in Johnson's medical treatment can be found in the report and recommendation that recommended their dismissal. *See* Dkt. No. 114.

On April 28, 2008, Johnson was transferred to Coxsackie RMU for a medical trip. Defs.' 7.1 Statement ¶ 5; Am. Compl. at 22. Medical Transport Officer John Doe Coffey, a defendant herein, secured Johnson into a transport vehicle with handcuffs, chains, and leg irons. Defs.' 7.1 Statement ¶ 5. Johnson alleges that he was fondled in the "groin area" by Coffey during this process. Am. Compl. at 22. Johnson claims that this was the third such incident. *Id.* Johnson and Correction Sergeant Wolfe discussed this incident several days later, and Wolfe said that he would conduct an investigation. *Id.* Johnson was scheduled for a medical trip on May 12, 2008. *Id.* He requested that Coffey not be the transport officer for that

trip. *Id.* On May 12, however, Coffey was the transport officer, but Wolfe supervised the process. *Id.* Johnson complained that the shackles around his ankles were too tight but Wolfe said that Johnson had enough room. *Id.*

**\*6** Dr. Enu had another appointment to discuss the liver biopsy with Johnson on July 30, 2008. *Id.* at ¶ 59. Johnson refused the procedure. *Id.* at 55. This appointment was the last time that Dr. Enu examined Johnson. *Id.* ¶ 54. Johnson was transferred to Greene on August 15, 2008. *Id.* ¶ 60.

### III. Discussion

#### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits that support the motion. *Id.; see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v.. Zenith Radio Corp.,* 475 U.S. 574, 585–86. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Id.* at 586. It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-moving party special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude,"; that a *pro se* litigant's submissions must be construed liberally,"; and that such submission must be read to raise the strongest arguments that they "suggest[.]" At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the *pro se* litigant's allegations, or arguments that the submissions themselves do not "suggest,"; that we should not "excuse frivolous or vexatious filings by *pro se* litigants," and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law."

*Id.* (internal citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.") (citations omitted).

**B. Eleventh Amendment Immunity**

**\*7** The Eleventh Amendment prohibits suits against a state in federal court unless the state consents or waives its immunity. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 (1984). A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997). The State has not consented to suit or waived its immunity here. § 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Daisernia v. New York,* 582 F.Supp. 792, 796 (S.D.N.Y.1984). Thus, a suit that seeks monetary damages from an official in his or her official capacity is barred even though asserted against the individual. *Kentucky v. Graham,* 473 U.S. 159, 169 (1985).

Johnson has named defendants in their official capacities as DOCS employees. *See* Am. Compl. at 2–6. Although defendants have not moved to dismiss on Eleventh Amendment grounds, it is recommended that the Court *sua sponte* dismiss any claims against defendants for money damages in their official capacities. *See* 28 U.S.C. § 1915(e)(2)(B)(iii).

**C. Personal Involvement**

Personal involvement is an essential prerequisite for § 1983 liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). A section 1983 defendant, however, cannot be liable "merely because he held a supervisory position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Supervisory personnel may be considered "personally involved" only if the defendant: (1) directly participated in the alleged constitutional violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that a violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN7]

> **FN7.** The Supreme Court's decision in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), casts doubt in the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531 (S.D.N.Y.2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

**1. McCoy, Duke, and Testo**

Besides naming McCoy, Duke, and Testo in the amended complaint, Johnson has made no allegations that those defendants engaged in the alleged unconstitutional conduct. Accordingly, those defendants should be granted summary judgment.

**2. Behrle, Graziano, Ambrosino, Heath, Mahar, and Gaines**

Behrle, Graziano, Ambrosino, Heath, Mahar, and Gaines either received letters from Johnson or responded to Johnson when he inquired as to why he was transferred to Greene from Hudson. *Id.* at 18–20. Without more, Johnson has not alleged the personal involvement of these defendants in any alleged unconstitutional conduct. Nor does Johnson allege that he notified these defendants of the alleged unconstitutional conduct. He merely inquired into reasons for the transfer. *See id.*

Further, even if Johnson alleged unconstitutional conduct in these letters, the "mere receipt of letters from

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

an inmate by a [supervisory official] regarding [unconstitutional conduct] is insufficient to constitute personal liability." *Gonzales v. Wright,* No. 9:06–CV–1424 (JMH), 2010 U.S. Dist. LEXIS 15953, at *28, 2010 WL 681323, at *10 (N.D.N.Y. Feb. 22, 2010) (citations omitted); *see also Booker v. Doe,* No. 9:06–CV–73 (GLS), 2008 U.S. Dist. LEXIS 76413, at *22, 2008 WL 4527601, at *7 (N.D.N.Y. Sept. 30, 2008) ("It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement.").

**\*8** Accordingly, these defendants should be granted summary judgment.

### D. Pendent State Law Claims

To the extent that Johnson's claims may be construed as pendent state law claims alleging lack of informed consent prior to treatment, such claims must fail. Federal courts have supplemental jurisdiction over pendent state law claims pursuant to 28 U.S.C. § 1367. It is recommended, herein, however, that defendants be granted summary judgment on Johnson's federal claims against them on which rests federal jurisdiction over the pendent state law claims. Johnson asserts no other basis for the Court's jurisdiction over these claims and, therefore, the Court should decline to exercise supplemental jurisdiction over Johnson's state law claims if the recommendations are accepted. *See* 28 U.S.C. § 1367(c)(3). Such causes of action should be dismissed without prejudice.

Moreover, even if the state law claims are addressed, they still fail. In order to state an actionable claim for failure to provide informed consent:

plaintiff must prove (1) that the person providing the professional treatment failed to disclose alternatives thereto and to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury.

*Foote v. Rajadhyax,* 702 N.Y.S.2d 153, 153 (N.Y.2000) (citations omitted). In this case, there is nothing in the record to show that the medical treatment that any of the defendants provided were the proximate cause of Johnson's injuries. In fact, there is nothing to show that Johnson was injured at all.

### E. Deliberate Medical Indifference

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*9** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. As such, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

In this case, defendants do not appear to challenge the fact that Hepatitis B and its potential complications or the resulting malignancies in Johnson's pancreas were serious medical needs. Rather, defendants contend that they were not deliberately indifferent.

### 1. Dr. Enu

Johnson contends that Dr. Enu was not receptive enough to a biopsy when the liver tumor was first discovered in 2006, refused to follow the advice of specialists who recommend a biopsy, and failed to refer Johnson to an oncologist. Am. Compl. at 25–26.

First, mere disagreements on treatment between a prison inmate and his doctor do not rise to the level of a constitutional violation. *Sonds,* 151 F.Supp.2d at 312. Likewise, even if other doctors, as Johnson argues, disagreed with Dr. Enu's prescribed treatment, Dr. Enu is entitled to his own medical judgment and the mere fact that he disagreed with other medical professionals is insufficient to show deliberate indifference even if Dr. Enu's judgment was misguided or negligent. *See Ortiz v. Makram,* No. 96 Civ. 3285, 2000 WL 1876667, at *10 (S.D.N.Y. Dec. 21, 2000).

Also, Johnson's refusal of the prescribed treatment further negates allegations of deliberate indifference. *See Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at *10 (N.D.N.Y. Sept. 29, 2010) (Lowe, M.J.) (citing *Rivera v. Goord,* 253 F.Supp.2d 735, 756

(S.D.N.Y.2003)). On May 14, 2008, Johnson refused a CT of his liver to evaluate whether a mass had become cancerous or spread. Defs.' Ex. B at 36–38. He refused the CT scan once again on June 19, 2008. *Id.* at 32–34. Finally, on July 30, 2008, Johnson refused a liver biopsy. *Id.* at 29. While Johnson might have refused the prescribed treatment because he disagreed with them, prisoners are not afforded the medical treatment of their choice. *Chance,* 143 F.3d at 703.

Finally, a review of Johnson's medical records fails to reveal any indication or suggestion that Dr. Enu was deliberately indifferent to Johnson's serious medical needs. Upon Johnson's transfer to Hudson on March 15, 2006, Dr. Enu reviewed Johnson's medical records. Defs.' Ex. B at 273. Dr. Enu conducted a physical examination of Johnson and learned of his Hepatitis B diagnosis approximately a week and a half later on March 27. *Id.* at 272. Dr. Enu ordered blood and liver function tests to evaluate Johnson's condition and repeated the tests after Johnson refused to believe the results. Defs.' Ex. B at 269–70. Dr. Enu also referred Johnson to outside specialists or other medical personnel when Hudson's facilities would be unable to provide assistance. *Id.* at 164 (consultation notes of Dr. Nigam reference referral from Dr. Enu), 176–80 (transfer to Coxsackie RMU because Johnson needed emergency care), 268 (ambulatory health record noting referral to a gastroenterology specialist). There is no indication that Dr. Enu was deliberately indifferent to Johnson's medical needs during the eighteen-month period that Johnson was under Dr. Enu's care.

**\*10** Accordingly, defendants' motion as to Dr. Enu should be granted on this ground.

### 2. Dr. Caulfield

Johnson asserts a delay in medical treatment claim against Dr. Caulfield. Am. Compl. at 18. A "delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas v. Nassau County Corr. Ctr,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (internal quotation marks omitted) (citing *Chance,* 143 F.3d at 703). "The Second Circuit has

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Thomas, 288 F.Supp.2d at 339* (internal quotation marks omitted) (citing *Espinal v. Coughlin,* No. 98 Civ. 2579, 2002 U.S. Dist. LEXIS 20, 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002)). Even if a prisoner is able to establish delay, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas, 288 F.Supp.2d at 339.*

The record is devoid of any facts demonstrating that Dr. Caulfield delayed the procedure as a form of punishment, ignored a life threatening and fast-degenerating condition, or delayed major surgery. Johnson accuses Dr. Caulfield of waiting two months before ordering a needle biopsy. Am. Compl. at 18. Johnson claims that Dr. Caulfield acted as if the procedure were elective, and he appeared to have no knowledge of Dr. Nigam's "order for a needle biopsy." *Id.* Johnson also believed that the procedure was required immediately because of the "urgency of [his] condition." *Id.* There is no indication, however, that the needle biopsy was an urgent procedure. Dr. Nigam merely stated that delaying pancreatectomy and spleenectomy in favor of a biopsy would mean a "small risk of cancer." Defs.' Ex. A (Dkt. No. 119–3) at 38. Moreover, Johnson has failed to proffer any evidence that his condition deteriorated or became worse as a result of the delay.

Accordingly, Dr. Caulfield should be granted summary judgment on to this ground.

### 3. Bogarski

Bogarski, a nurse administrator, is accused of ignoring Johnson's questions and concerns about Hepsera, and removing Johnson from the examination room for no reason on November 17, 2006. Am. Compl. at 9. An ambulatory health record signed by Bogarski and dated November 17, 2006, indicates that Johnson became "verbally upset" and "uncooperative" as an "inquisition into [Johnson's] health history [was] attempted." Defs.' Ex. B at 258. Johnson "was asked to leave the medical office," and security was notified. *Id.* 6.

Johnson also accuses Bogarski of ignoring two letters

where Johnson inquired about the need for pancreatic surgery and a reevaluation for the canceled pancreatic surgery. Am. Compl. at 9, 17. On January 9, 2007, four days after Johnson's surgical consultation with Dr. Nigam, Johnson sent a letter to Bogarski, "requesting further clarity on the proposed surgery." *Id.* at 9. Then on March 17, 2007, approximately a month and a half after the surgery was canceled, Johnson wrote to Bogarski to request a reevaluation of the canceled surgery. *Id.* at 17. It does not appear that Bogarski responded to either of these letters. *See id* .

**\*11** These allegations fail to establish deliberate indifference on the part of Bogarski. There is no indication that Johnson failed to receive medical care and treatment for his conditions after Bogarski asked him to leave the medical department on November 17, 2006, or after Bogarski allegedly ignored Johnson's letters. Johnson continued to receive medical evaluations and monitoring of his liver conditions by medical staff. *See generally* Defs.' Ex. B.

Accordingly, defendants should be granted summary judgment on this ground.

### 4. Reuteneaur

Reuteneaur, a nurse, was allegedly present at a February 2, 2007, medical appointment that Johnson had with Dr. Enu. Am. Compl. at 14; see also Defs.' Ex. B at 88 (ambulatory health record signed by Dr. Enu showing a medical consult on February 2, 2007). After Dr. Enu told Johnson that he would receive a biopsy when the need for one arose, Johnson asked what his treatment would be should his condition become serious. Am. Compl. at 14. Reuteneaur allegedly told Johnson that "there would be nothing [that medical staff] could do" because Johnson refused the surgery.

While Johnson may contend that this amounted to deliberate indifference, Johnson has proffered no facts to support this conclusory statement. Moreover, a review of the record further belies a deliberate indifference claim as Johnson continued to receive medical evaluations to monitor the progression of his disorders. *See generally* Defs.' Ex. B. Accordingly, summary judgment as to Reuteneaur should be granted.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

### 5. Meicht

Nurse Meicht examined Johnson on December 13, 2006, because Johnson was experiencing stomach discomfort. Am. Compl. at 11; Defs .' Ex. B at 256. Johnson received stomach fiber before leaving. Am. Compl. at 11. Meicht also made an appointment for Johnson to see Dr. Enu. Defs.' Ex. B at 256. Without more, there is nothing to show that Meicht acted with deliberate indifference to Johnson's medical needs. Accordingly, Meicht should be granted summary judgment on this ground.

### F. Misbehavior Report and Keeplock Confinement

The amended complaint alleges that Meicht issued a false misbehavior report against Johnson on March 2, 2007. Am. Compl. at 16. Johnson possessed no constitutional right to be free "from falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," but he is still entitled "not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Thus, a fair hearing would cure any due process violations resulting from false accusations. *Grillo v. Coughlin,* 31 F.3d 53, 56 (2d Cir.1994); *Livingston v. Kelly,* 561 F.Supp.2d 329, 331 (W.D.N.Y.2008) ("As the Second Circuit noted ..., an inmate's allegation that he has been found guilty of false disciplinary charges may support a constitutional claim if he also alleges that he was denied the minimal procedural due process protections ....").

**\*12** To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Also, due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). This standard requires a

prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F .3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with confinement in keeplock [FN8] or a special housing unit [FN9] alone is insufficient to establish an atypical and significant deprivation.

> [FN8.] "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

> [FN9.] SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

Hearing Officer Winnie sentenced Johnson to thirty-days in keeplock confinement. Defs.' Ex. D at 1. Winnie also suspended Johnson's recreation, package, commissary, and phone privileges for fifteen days. *Id.* District courts have noted that "decisions in the Second Circuit are unanimous that keeplock ... of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin." Auleta v. LaFrance,* 233 F.Supp.2d 396, 398 (N.D.N.Y.2010) (citing *Williams v. Keane,* No. Civ. 95–0379(AJP)(JGK), 1997 WL 527677, at \*6–8 (S.D.N.Y. Aug. 25, 1997) (Peck, M.J.) (citing cases)). Moreover, "the loss of phone, telepackage, and commissary privileges does not give rise to a protected liberty interest under New York law." *Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006) (citing *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998), citing in turn *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)). Thus, Johnson did not have a protected liberty interest.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

Even if Johnson had a protected liberty interest, he received a fair and impartial hearing. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Prisoners are "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted). Due process requires written notice twenty-four hours prior to the commencement of a formal disciplinary hearing in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are .... " *Wolff,* 418 U.S. at 564 (citations omitted). "The effect of the notice should be to compel the charging officer to be sufficiently specific as to the misconduct ... charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges ...." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (citations omitted). Such notice guarantees a meaningful hearing whereupon a prisoner can properly defend himself against the pending charges. *Id.* at 193.

**\*13** Here, the misbehavior report was delivered on March 2, 2007, and the hearing was held on March 8, 2006, giving Johnson six days to prepare a defense. Defs.' Ex. D at 1. Johnson also had the opportunity to present a defense, and he declined to call any witnesses. *Id.* at 2–3. Accordingly, defendants should be granted summary judgment 0n this claim.

### G. Interference with Grievance Process

Johnson accuses Rother, John Doe # 1, and John Doe # 2 of interfering with grievances that he had filed. Am. Compl. at 10, 23. The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See 370 Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a

cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F. Su pp.2d 385, 390 (W.D.N.Y.1998).

Accordingly, it is recommended that defendants be granted summary judgment on this ground.

### H. Sexual Harassment

Johnson claims that he was fondled in the "groin area" by Coffey on three separate occasions. Am. Compl. at 22. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. It is well settled that the "unnecessary and wanton infliction of pain on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Boddie,* 105 F.3d 857, 861 (2d Cir.1997) (citing *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). In order to prove a violation of the Eighth Amendment, a plaintiff must satisfy both an objective and a subjective inquiry. *See Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003). A prison official violates the standards of the Eighth Amendment when (1) the alleged punishment is "objectively, sufficiently serious" and (2) he or she acted with a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Because sexual abuse by a prison official with a culpable state of mind may constitute a violation of contemporary standards of decency and cause severe harm to the prisoner, such allegations may be cognizable under the Eighth Amendment. *Boddie,* 105 F.3d at 861 ("[S]evere or repetitive sexual abuse of an inmate ... can be 'objectively, sufficiently serious.' "); *see also Farmer,* 511 U.S. at 834–35 ("[The] rape of one prisoner ... serves no legitimate penological objective, any more than it squares with evolving standards of decency.") (internal quotation marks and citations omitted).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

**\*14** On the other hand, sexual harassment violates the Eighth Amendment only if the harm is "objectively, sufficiently serious." *Boddie,* 105 F.3d at 861. The Second Circuit has held that a small number of isolated incidents of alleged sexual abuse, including verbal harassment, may not suffice to meet the objective prong of the test or involve a harm of a federal constitutional level. *Id.* Further, a plaintiff must demonstrate that an incident or series of incidents were sufficiently egregious to be "objectively, sufficiently serious" to the point where such actions resulted in the denial of "the minimal civilized measure of life's necessities" and posed a substantial risk of serious harm. *Id.; Trammel,* 338 F.3d at 161. The Supreme Court has also held that a plaintiff must prove that a defendant used force "maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995 (1992).

Coffey is a corrections officer, and his responsibility includes serving as a "transport officer for prisoners being taken to various places away from Hudson." Coffey Decl. (Dkt. No. 119–11) ¶¶ 1, 5. While securing a prisoner for transport, departmental policy requires securing the prisoner in a particular way, including placing a chain around the prisoner's waist. *Id.* ¶ 9. Occasionally, an "extra length chain is positioned so that it comes in contact with the prisoner's groin and waist area." *Id.* ¶ 10. Coffey states that his hands never came in contact with Johnson's groin area on the day in question. *Id.* ¶ 15. A DOCS investigation concluded that Johnson's allegations against Coffey were without merit. *See* Defs.' Ex. E (Dkt. No. 119–7) at 11–21.

Even if Coffey's hands had come into contact with Johnson's groin area while securing Johnson for transport, Johnson's allegations are insufficient to articulate a claim of constitutional dimensions. In *Boddie,* the Second Circuit dismissed as inadequate a prisoner's claim that a female corrections officer made a possible pass at him, squeezed his hand, touches his penis called him a "sexy black devil," pressed her breasts against his chest, and pushed her vagina against his penis. *Boddie,* 105 F.3d at 859–61. The Second Circuit concluded that no single incident was "severe enough to be 'objectively, sufficiently serious,' [n]or were the incidents cumulatively egregious in the harm they inflicted" to "involve harm of

federal constitutional proportions as defined by the Supreme Court." *Id.* at 861; *see also Morales v. Mackalm,* 278 F.3d 126, 132 (2d. Cir.2002) (allegations that staff member asked plaintiff to have sex with her and to masturbate in front of her and other staff members "do not even rise to the level of those made by the plaintiff in *Boddie,* [and] do not state a claim for sexual harassment in violation of the Eighth Amendment to the United States Constitution."); *Excell v. Fischer,* 08–CV–945, 2009 WL 3111711, at \*6–7 (N.D.N.Y. Sep. 24, 2009) (Hurd, J., adopting Report–Recommendation on de novo review) (claim that officer grabbed and squeezed plaintiff's penis during strip search for contraband relates a "quick, isolated incident of inappropriate touching" but not an Eighth Amendment violation); *Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (allegation that corrections officer grabbed inmate's penis during pat frisk is insufficient to state constitutional claim); *Morrison v. Cortright,* 397 F.Supp.2d 424, 425 (W.D.N.Y.2005) (allegations that a corrections officer touched plaintiff's buttocks, and that another "rubbed up against plaintiff['s] buttocks with [the officer's] private part" during a strip search describe an isolated incident unaccompanied by physical injury, and therefore are not sufficiently serious to establish a constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 373, 375 (S.D.N.Y.2001) (allegation that corrections officer squeezed inmate's genitalia during pat-frisks on several occasions does not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such conduct).

**\*15** Accordingly, Coffey should be granted summary judgment as on this claim.

### I. Excessive Force

On May 12, 2008, while securing Johnson for transport, Coffey allegedly placed the leg irons "extremely tight."[FN10] The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

> FN10. Although Johnson characterized this incident as a form of harassment (Dep. Tr. at 23), it is more appropriately analyzed as an excessive force claim.

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344

F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

In this case, Johnson fails both prongs of the Eighth Amendment analysis. The alleged exertion of force resulted in no medically determinable injury to Johnson as a medical examination following the incident revealed "no bruises, no open areas, [and] no swelling" around Johnson's ankles. Defs.' Ex. B at 39–41. Moreover, an investigation concluded that Johnson was not shackled too tightly at all. Defs.' Ex. E (Dkt. No. 119–7) at 29. Johnson has proffered no evidence to raise an issue of material fact as to whether excessive force was used in this instance.

**\*16** Accordingly, defendants should be granted summary judgment on this claim.

### J. Verbal Harassment

Johnson claims that he was verbally harassed. Am. Compl. at 29. Verbal harassment alone, however, is not actionable under § 1983. See *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("The claim that a prison guard called [plaintiff] names ... did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem do not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983 ."). Accordingly, defendants' should be granted summary judgment as to this claim.

### K. Retaliation

Johnson alleges defendants' engaged in unconstitutional conduct in retaliation for Johnson's filing of grievances. Am. Compl. at 29–30. To state an actionable claim for retaliation, a plaintiff must first allege that his conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *see also Lipton v. County of Orange,* 315 F.Supp.2d 434, 447–48 (S.D.N.Y.2004) (applying First Amendment retaliation factors to a pretrial detainee complaint). "Adverse action" is action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights. *See Mt.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

*Healthy Cit. Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

The filing of grievances is a constitutionally protected activity. *See Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003). Johnson, however, has failed to allege facts sufficient to support a retaliation claim. Johnson has only stated in conclusory terms that defendants were retaliating against him for filing grievances. Johnson offers no evidence to support his allegations, either through documentation or witness testimony. Thus, he has failed to allege specific facts from which one could conclude that defendants' actions were motivated by Johnson's constitutionally protected activities.

**L. Conspiracy**

Johnson alleges that defendants conspired together to deprive him of his constitutional rights. Am. Compl. at 30. "Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v.. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

**\*17** (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–29 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). "In addition, the conspiracy must be motivated by some class-based animus." *Hasty,* 490 F.3d at 176 (citations omitted).

Here, Johnson does not assert any facts giving rise to a conspiracy. First, Johnson vaguely asserts conclusory statements relating to an alleged conspiracy among defendants. This is insufficient. *See generally Thomas v. Roach,* 165 F.3d 137, 147 (2d Cir.1999) (granting summary judgment for a § 1985(3) claim where the "assertions were conclusory and vague, and did not establish the existence of an agreement among defendants to deprive [plaintiff] of his constitutional rights."). Second, there has been proffered no evidence relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive Johnson of his civil rights. Lastly, there is no evidence that any alleged conspiracy was motivated by racial- or class-based animus.

Accordingly, defendants' motion as to this claim should be granted.

**M. Qualified Immunity**

Defendants also argue that they are entitled to qualified immunity. Defs.' Mem. of Law (Dkt. No. 119–13) at 12. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002), aff'd, 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Helmer's allegations as true, he has not shown that defendants violated his constitutional rights.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

**\*18** Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted.

### IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 119) be **GRANTED** in its entirety and that judgment be entered in favor of all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.D.N.Y.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).*

N.D.N.Y.,2011.

Johnson v. Enu
Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2011 WL 3439524
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eric JOHNSON, also known
as Debah J. Smith, Plaintiff,
v.
Ayshia ENU, Physician, Hudson Correctional
Facility; Peter Bogarski; Reuteneaur, Jane Doe;
McCoy, John Doe; H.M. Miles; Joyce Duke; Wolff,
John Doe; Rother, Jane Doe; George, John Doe;
Testo, John Doe; Peter Behrle; M. Graziano;
Michael Ambrosino; Philip Heath; T. Mahar, Senior
Correction Counselor, Greene Correctional Facility;
T. Gaines; Caulfield, John Doe; John Doe 1; John
Doe 2; Karen Meicht, Nurse, Hudson Correctional
Facility; Winnie, Lieutenant, Hudson Correctional
Facility; and Coffey, John Doe, Defendants.

No. 9:08–CV–158 (FJS/DRH).
|
Aug. 5, 2011.

**Attorneys and Law Firms**

Eric Johnson also known as Debah J. Smith, Brooklyn, NY, pro se.

Office of the New York, State Attorney General, Dean J. Higgins, AAG, of Counsel, Albany, NY, for Defendants.

**ORDER**

[SCULLIN](), Senior District Judge.

**\*1** Plaintiff commenced this action pursuant to [42 U.S.C. § 1983](), [1985](), alleging that Defendants violated his constitutional rights. *See* Dkt. No. 64, Amended Complaint. On November 12, 2010, Defendants filed a motion for summary judgment. *See* Dkt. No. 119. Plaintiff did not file any papers in opposition to that motion. In a Report–Recommendation and Order dated July 13, 2011, Magistrate Judge Homer recommended that the Court grant Defendants' motion for summary judgment in its entirety and enter judgment in favor of Defendants on all

claims. *See* Dkt. No. 121 at 35. Plaintiff did not file any objections to these recommendations.

When a party does not object to a magistrate judge's report-recommendation, the court reviews that report-recommendation for clear error or manifest injustice. *See* [Linares v. Mahunik,]() No. 9:05–CV–625, 2009 WL 3165660, *10 (N.D.N.Y. July 16, 2009) (citation and footnote omitted). After conducting this review, "the Court may 'accept, reject, or modify, in whole or in part, the ... recommendations made by the magistrate judge.' " *Id.* (quoting [28 U.S.C. § 636(b)(1)(C)]()).

The Court has reviewed Magistrate Judge Homer's July 13, 2011 Report–Recommendation and Order for clear error and manifest injustice; and, finding none, the Court hereby

**ORDERS** that Magistrate Judge Homer's July 13, 2011 Report–Recommendation and Order is **ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED in its entirety;** and the Court further

**ORDERS** that Plaintiff's federal claims are **DISMISSED with prejudice;** and the Court further

**ORDERS** that Plaintiff's state-law claims are **DISMISSED without prejudice** pursuant to [28 U.S.C. § 1367](); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3439524

**End of Document**

2000 WL 362023
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Marvin Joseph PITSLEY, Plaintiff,

v.

R. RICKS, First Deputy Superintendent,
Clinton Correctional Facility; and J.
Wood, Deputy Superintendent of Security,
Clinton Correctional Facility, Defendants.

No. 96–CV–0372NAMDRH.
|
March 31, 2000.

**Attorneys and Law Firms**

Marvin Joseph Pitsley, Attica Correctional Facility,
Attica, for Plaintiff, pro se.

MEMORANDUM–DECISION AND ORDER

MORDUE, District J.

Introduction

**\*1** *Pro se* plaintiff, Marvin Joseph Pitsley ("plaintiff"
or "Pitsley"), an inmate in the custody of the New York
State Department of Correctional Services, commenced
this action on February 29, 1996, alleging a violation
of various constitutional rights. By decision and order
dated April 10, 1998, then District Judge Rosemary
Pooler dismissed all of plaintiff's claims except his
claim against defendants Ricks and Wood concerning
an alleged violation of Pitsley's First Amendment
right to communicate with his family and friends.
Thereafter, defendants Ricks and Wood moved for
summary judgment. In a Report–Recommendation dated
September 2, 1999, Magistrate Judge David Homer states
that "[w]hile the general right of inmates to reasonable
access to communications is well established, the contours
of the right with respect to telephones in particular are
uncertain." Dkt. no. 63, p. 6. Observing that the Supreme
Court and Second Circuit have not yet directly addressed
the topic of the constitutionality of restricted telephone
access, the Magistrate Judge, quoting *Carter v. O'Sullivan,
924 F.Supp. 903, 909 (C.D.Ill.1996)*, recommends that
summary judgment be granted defendants on the grounds
of qualified immunity. [1]

Plaintiff filed timely objections to the Report–
Recommendation. Pursuant to 28 U.S.C. § 636(b)(1)(C),
a district court must make a *de novo* determination of the
portions of a Report–Recommendation that are objected
to. This Court will therefore consider plaintiff's arguments
as set forth in his Objections.

*Factual Background*

At the time in question, Pitsley was an inmate at the
Clinton Correctional Facility. He alleges that, on October
9, 1995, he lost his job at Clinton's tailor shop. As
a result, on October 16, 1995, Pitsley appeared before
Clinton's facility program committee where he was offered
a position in either the laundry or bath house. Dkt.
no. 52, Ex. H. He states that he refused to accept either of
the new positions offered to him because "he was not going to take
a job which could cause health problems." [2] Dkt. no. 1.,
p. 4. As a result of plaintiff's refusal, on October 16, 1995,
Pitsley was assigned to Limited Privileges Status ("L.
P. Status") at Clinton. L.P. Status circumscribes access
to various services and amenities available to inmates.
Among other items, inmates receive no pay and are not
allowed to participate in the Family Reunion Program,
the Home Phone Program, the Cell Study Program, the
Regular Library Program, special events, movies and all
evening programs. [3] Under Clinton policy, full privileges
are restored once the inmate recommences participation
in prison programs.

Pitsley states that while confined on L.P. Status, he was
denied his First Amendment right to communicate with
family and friends. [4] Specifically, Pitsley maintains that
while he was on L.P. Status, he was denied permission to
call his step daughter after she telephoned the facility to
advise that her son was in the hospital for major surgery.
Pitsley claims that he was also unable to correspond with
his family because he was earning no wages and had no
money available to purchase stamps. Dkt. no. 54, pp. 2,
4, 5, 11. He also alleges that he was denied permission to
telephone his attorney regarding important legal business
which resulted in his action being "denied by the trial
court." *Id.* at p. 5; *see also* dkt. no. 52, Pl. Int. Resp. No.
08 and attachments 04 and 05. [5]

**\*2** Financial records show that from November 7, 1995 to February 14, 1996, Pitsley had a balance of $.04 in his inmate account. On February 14, 1996, a deposit of $8.25 was made into Pitsley's inmate account (an apparent refund from the State Comptroller). From that amount, Pitsley made commissary purchases and also purchased $.79 worth of postage. As of March 28, 1996, however, Pitsley had a negative balance of $2.46 in his inmate account. [6] Pitsley claims that afterwards, no other funds came into his possession while he was confined to L.P. Status at Clinton. Pitsley was eventually transferred to Auburn Correctional Facility on January 27, 1997. [7]

On February 22, 1996, Pitsley filed a grievance wherein he stated the following: "The facility can not purposely try to prevent an inmate access to his family without being liable in court. I want to be able to make a call to my family and attorney, or else the facility provide postage to write my family." Dkt. no. 52, Ex. A. Pitsley maintains that defendant Ricks denied the grievance. On appeal, the Department of Correctional Services' Central Office Review Committee sustained the decision made at the facility level and stated the following in relevant part: "Grievant is advised of FOMP # 324 which states in part, ... 'Limited Privilege Program will restrict your yard, movies, commissary, pay, phone home program, regular library, etc.' Free postage is available for legal mail only."

It is with this background that the Court reviews defendants' motion for summary judgment. [8]

## DISCUSSION

### 1. Standards

### A. SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings, affidavits, and other supporting papers indicate that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 247 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). To defeat a motion for summary judgment the opposing party must do more than present evidence that is merely colorable, conclusory, or speculative, *Anderson,* 477 U.S. at 249–50 but rather, must demonstrate that there are issues of fact that must be

decided by a fact finder, because "they may reasonably be decided in favor of either party." *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see Webber v. Hammack,* 973 F.Supp. 116, 121–23 (N.D.N.Y.1997).

### B. SECTION 1983

In order to obtain relief under 42 U.S.C. § 1983 a plaintiff must establish that he was deprived of a right, privilege or immunity protected under the United States Constitution or by a federal statute by a person acting under state authority. *Parratt v. Taylor,* 451 U.S. 527, 535, (1981), overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330–31 (1986) (more than negligence required); *Rodriguez v. Phillips,* 66 F.3d 470, 473 (2d Cir.1995). The Fourteenth Amendment to the United States Constitution prohibits the depriving of an individual of a protected liberty interest without due process. *Hewitt v. Helms,* 459 U.S. 460, 466 (1983). The issues to be determined are, first, whether the plaintiff possessed a constitutionally protected liberty interest which was interfered with and second, whether the procedures followed were constitutionally sufficient. *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, (1989); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). Constitutionally protected liberty interests of a prison inmate are limited to freedom from restraints which exceed his sentence in an unexpected manner or which impose a grievous or "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 482 (1995). Plaintiff has the burden of demonstrating the existence of a protected liberty interest and the infringement thereupon. *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*3** So as to ensure that courts afford appropriate deference to prison officials in their management of correctional facilities and in their efforts to secure order, the Supreme Court has determined that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test. *See e.g., Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 128 (1977). The Supreme Court has stated the standard as follows: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89; *Hayes v. Marriott,* 70 F.3d 1144, 1146 (10th Cir.1995).

In order to state a claim for deprivation of a constitutional right to communication, an inmate must make some

showing of prejudice or actual injury as a result of the prison officials' conduct. *See, e.g., Sands v. Lewis,* 886 F.2d 1166, 1171 (9th Cir.1989)(deprivation of telephone access). In a legal deprivation claim, an inmate must proffer specific instances of prejudice to his legal rights, such as missed filing deadlines or the denial of legal assistance to which he was entitled. *See Martin v. Davies,* 917 F .2d 336, 340 (7th Cir.1990).

## C. QUALIFIED IMMUNITY
Qualified immunity is an affirmative defense which "shields public officials from liability for their discretionary acts that do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1995). Even if an inmate's federal rights have long been recognized, "qualified immunity is still available to an official if it was 'objectively reasonable for the public official to believe that his acts did not violate those rights." ' *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)).

2. The Reasonableness of Restrictions on Pitsley's Ability to Communicate
The Court notes that plaintiff's claim regarding inability to communicate through the mail is one alleging a constructive deprivation. That is, plaintiff does not allege that L.P. Status, by its terms, deprived him of the ability to communicate through the mail. To the contrary, defendants state that under the L.P. Status, "[i]nmates are still permitted to contact their family and friends by mail." Ricks Aff. at ¶ 7.

Plaintiff alleges that he had no money and, because of his L.P. Status, was incapable of earning any money. As such, plaintiff alleges that his indigence resulted from, or was perpetuated by, his L.P. Status. This, according to plaintiff, resulted in his inability to purchase stamps and communicate through the mail. As such, there is no evidence to suggest that plaintiff was deprived of all forms of communication as a result of his L.P. Status. There is support, however, for the argument that the *effect* of defendants' policies was to deprive him of all means of communication.

**\*4** The Supreme Court has recognized that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley,* 482 U.S. 78, 84 (1987), "nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.' " *Thornburgh v. Abbott,* 490 U.S. 401, 407 (1989). Accordingly, federal courts have held that "[a] prison inmate's rights to communicate with family and friends are essentially First Amendment rights subject to § 1983 protection." *Morgan v. LaVallee,* 526 F.2d 221, 225 (2d Cir.1975). However, because of security concerns which are inherent in correctional facilities, the First Amendment's protection of communication is not without restriction. *Martin v. Tyson,* 845 F .2d 1451, 1457 (7th Cir.1988), citing *Martin v. Brewer,* 830 F.2d 76, 78 (7th Cir.1987). For example, "[t]he exact nature of telephone service to be provided to inmates is generally to be determined by prison administrators, subject to court scrutiny for unreasonable restrictions." *Fillmore v. Ordonez,* 829 F.Supp. 1544, 1563–64 (D.Kan.1993), *aff'd,* 17 F.3d 1436 (10th Cir.1994).

The right to communication, grounded as it is in the First Amendment, is plainly a "liberty" interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment, and, as such, it is protected from arbitrary governmental invasion. *Procunier v. Martinez,* 416 U.S. 396, 413 (1971), overruled on other grounds by *Thornburgh v. Abbott,* 490 U.S. 401 (1989). Under this umbrella, a hierarchy has developed amongst the type of protection afforded to the various modes of communication. For example, while inmates have a constitutionally protected interest in conducting non-legal correspondence, *Thornburgh v. Abbott,* 490 U.S. 401 (1989), such correspondence is not afforded the same degree of protection as legal correspondence. *See Todaro v. Bowman,* 872 F.2d 43, 49 (3rd Cir.1989) (requiring substantial governmental interest in censorship of legal mail). Similarly, telephone calls to and from attorneys have received a higher degree of protection from the courts than telephone privileges generally. *See Ramos v. Vaughn,* 1995 WL 386573 at \*8 (E.D.Pa. June 27, 1995), *aff'd 85* F.3d 612 (3rd Cir.1996).

Courts considering prison telephone restrictions have agreed that an inmate has no right to unlimited telephone use. *Washington v. Reno,* 35 F.3d 1093, 1100 (6th Cir.1994); *Benzel v. Grammar,* 869 F.2d 1105, 1108 (8th Cir.1989); *Lopez v. Reyes,* 692 F.2d 15, 17 (5th Cir.1982); *Fillmore v. Ordonez,* 829 F.Supp. 1544, 1563–

64 (D.Kan.1993), aff'd. 17 F.3d 1436 (10th Cir.1994); *see also Strandberg v. City of Helena,* 791 F.2d 744, 747 (9th Cir.1986); *Gilday v. Dubois,* 124 F.3d 277, 293 (1st Cir.1997); *Martin v. Tyson,* 845 F.2d 1451, 1458 (7th Cir.1988).[9] Courts have likewise recognized reasonable restrictions on personal correspondence to and from inmates so as to effectuate the safety and security of particular correctional facilities. *See Turner,* 482 U.S. 78 (1987).

**\*5** Prison regulations imposing restrictions on inmate phone calls have generally been upheld because the restrictions have been interpreted as furthering a legitimate penological interest. However, in those circumstances where telephone restrictions have been upheld, the Courts have usually noted that the affected inmates have alternate means of communicating with the outside world, most often by use of the mail. *See, e.g., Rivera v. Senkowski,* 62 F.3d 80 (2d Cir.1995); *Acosta v. Brady,* 1999 WL 158471, \*7 (E.D .Pa. March 22, 1999). In this instance, and as stated, Pitsley has alleged not only that he was not able to place telephone calls to family and friends, but that he was also unable to write to them because he was indigent and received no pay or other money while on L.P. Status.[10]

While inmates have a constitutionally protected interest in conducting non-legal correspondence, *see Thornburgh v. Abbott,* 490 U.S. 401 (1989) and *Procunier v. Martinez,* 416 U.S. 396 (1974), the Constitution does not require the State to subsidize inmates to permit such correspondence to be conducted by mail "when other means of communication are available to the general prison population." *Dawes v. Carpenter,* 899 F.Supp. 892, 899 (N.D.N.Y.1995) (citing *Hershberger v. Scaletta,* 33 F.3d 955, 956 (8th Cir.1994)). In this case, however, Pitsley has offered evidence that he had no alternative means of communication because his confinement to L.P. Status prevents him from using the telephone and buying stamps. He therefore claims that the State must make available some means for him to communicate with the outside.

While the foregoing case law holds that prison officials may not terminate all forms of communication with the outside world, there is no case law addressing the unique factual circumstances of the present case. The Court has previously characterized plaintiff's complaint as one stating absolute prohibition of telephone communication coupled with an *effective* prohibition of communication through the mail. The fact remains that L.P. Status, by its terms, allows inmates to communicate through the mail. It cannot, therefore, be accurately stated that the policy directly terminates all forms of communication in violation of clearly established law. Thus, because L.P. Status does not directly curtail all forms of communication, and because the law does not clearly address plaintiff's argument of indirect infringement, the Court concludes that the law is not clearly established and that prison officials were objectively reasonable for believing that their acts did not violate established rights.[11]

This Court also finds unpersuasive Pitsley complaints that he was not provided with a misbehavior report or disciplinary hearing prior to his assignment to L.P. Status. Assignment to L.P. Status, on the basis of procedures set forth in the Clinton Facility Operations Manual, without benefit of a misbehavior report or a hearing, but with notice and the opportunity to present one's views to the prison official who was charged with transferring an inmate to L.P. Status, has previously been determined not to violate due process. *Dixon v. Leonardo,* 866 F.Supp. 987 (N.D.N.Y.1995) (McAvoy, C.J .).

CONCLUSION

**\*6** After careful review of the record, including the Report–Recommendation, I conclude that Pitsley's objections to the Report–Recommendation lack merit and I find that the remainder of the report-recommendation was not clearly erroneous. It is therefore,

ORDERED that the Report–Recommendation dated September 2, 1999, is approved, and it is further

ORDERED, that the Motion for Summary Judgment filed by Defendants Ricks and Woods is GRANTED, and it is further

ORDERED, that Plaintiff's action, No. 96–CV–0372 is DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 362023

Footnotes

1    As Magistrate Judge Homer commented, a public official is entitled to qualified immunity when, at the time the officer was acting, the right in question was not clearly established or, even if the right was established, it was not objectively reasonable for the official to have known that his conduct violated the right. *Connell v. Signoracci,* 153 F.3d 74, 80 (2d Cir.1988). In assessing whether the right was clearly established at the time defendants acted, courts "examine whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether under preexisting law, a defendant official would have reasonably understood that his acts were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995).

2    Pitsley asserts that a previous decision to place him in the laundry had been reversed for medical reasons. From documentation submitted by defendants regarding Pitsley's job performance in September, 1995, it appears that Pitsley did suffer from health problems, though the extent of those problems is unclear from the record. Dkt. no.52, Ex. H.

3    According to a memorandum from defendant Woods, dated September 7, 1995, keeplock inmates, with the exception of those inmates like Pitsley who had their telephone privileges restricted, could make two phone calls per month. Dkt. no. 52, Pl. Int. Resp., attachment 08.

4    Pitsley claims that in June of 1996, he attempted to obtain release from L.P. Status by requesting other programming but that he was unsuccessful in his efforts.

5    The facility claims that permission to contact his attorney was not denied. Instead, Pitsley was required to have his attorney first write a letter to the facility and request permission to make a legal telephone call. Pitsley was also advised that, in any such request, his attorney should advise as to why a telephone call was necessary as opposed to communicating through the mail.

     Dkt. no. 52, Pl. Int. Resp. No. 08 and attachments 04 and 05.

6    The inmate correspondence program directive attached to defendants' motion papers, dkt. no. 52, Ex. G, provides for advances for personal postage to various categories of inmates who might not otherwise be able to purchase postage. Specifically, the Directive states that:

     Funds may be advanced to an inmate for postage for one first class one-ounce letter per month in the following circumstances:

     a. the inmate has been confined to SHU for discipline or administrative segregation for 30 days or more, and has a zero or negative account balance; or

     b. the inmate has been in keeplock status for 30 days or more, has lost telephone privileges, and has a zero or negative account balance; or

     c. the inmate has lost telephone privileges, has a zero or negative account balance, and has not refused to accept available programming assignments.

7    The Second Circuit has previously characterized the restrictions imposed by L.P. Status as minimal and not sufficiently serious to provide a basis for an Eighth Amendment claim based on deliberate indifference for deprivation of life's necessities, particularly in view of the fact that an inmate can remove himself from the status at any time by accepting a program assignment. *Rivera v. Senkowski,* 62 F.3d 80, 85 (2d Cir.1995).

8    Shortly after filing his grievance, Pitsley filed his complaint in this action. In his complaint Pitsley alleged that "[t]he facility is refusing to allow a call home and the facility does not provide for free postage except for legal mail so plaintiff has no way of contacting his family." Dkt. no. 1, p. 5. Judge Rosemary Pooler, presently sitting on the Second Circuit Court of Appeals, had previously been assigned to this case in her prior capacity as District Court Judge. While Judge Pooler characterized Pitsley's First Amendment claim as an alleged violation of Pitsley's right "to communicate with family and friends," Magistrate Judge Homer, in his Report–Recommendation on the instant motion for summary judgment, states that all claims apart from Pitsley's claim "concerning telephone privileges" have been dismissed. This interpretation by Magistrate Judge Homer of Pitsley's claim, as limited to telephone restrictions only, as opposed to Judge Pooler's prior characterization of Pitsley's First Amendment claim as a more comprehensive right to communicate with family and friends, is important as it obviously impacts the analysis to be accorded to defendants' motion for summary judgment. Furthermore, Pitsley's complaint and papers in opposition to defendants' motion are clearly not limited to restrictions on telephone access. This Court considers plaintiff's complaint in light of both alleged denial of telephone privileges and the right to communicate through use of the mail.

9    Moreover, the loss of various privileges, including telephone access, has not been viewed as resulting in the type of deprivation which could reasonably be viewed as imposing atypical and significant hardship on a prison inmate under the analysis set forth in *Sandin v. Conner,* 515 U.S. 472 (1995) and its progeny. *Frazier v. Coughlin,* 81 F.3d 313, 315–

17 (loss of commissary, recreation, packages and telephone privileges while in SHU and later in Close Supervision Unit did not amount to atypical and significant deprivation); *DeMaio v. Kelly,* No. 95–CV–0329E(H), 1996 WL 685729, at * 2 (W.D.N.Y. Nov. 22, 1996) *Nogueras v. Coughlin,* No. 94 Civ. 4094(JSM), 1996 WL 487951, at *5 (S.D.N.Y.Aug.27, 1996); *Guzman v. Kelly,* No. 88–CV–1391E, 1996 WL 291985, *3 (W.D.N.Y. May 28, 1996); *Brooks v. DiFasi,* 1997 WL 436750, *2 (W.D.N.Y. July 30, 1997).

10 As stated, Pitsley claims that he was unable to contact his stepdaughter after she contacted the facility to advise that her son was about to undergo a serious operation. He also claims that obstacles in placing a telephone call to his attorney resulted in a legal action being dismissed. He argues that his attempts to have these matters rectified at the facility level went for naught as his grievance requesting permission to contact family and friends through the telephone or mail was denied.

11 The Court notes that plaintiff's inability to communicate with friends and family as a result of his indigence is, arguably, self imposed. That is, plaintiff maintained an $8.25 balance in his prisoner account shortly before filing the present action. Plaintiff spent only .$79 of this money on postage. Had plaintiff spent his money more wisely, he would have been able to communicate through the mail. Likewise, plaintiff could have used a single stamp to request someone from outside the prison to provide him with postage. Similarly, plaintiff may well have been able to obtain postage from his attorney, as plaintiff was able to communicate through the mail with his attorney.

Furthermore, the Court notes that plaintiff's indigence was exacerbated as a result of his refusal to accept one of two jobs offered him by prison officials. As noted by the Second Circuit, an inmate can remove himself from L.P. Status at any time by accepting a program assignment. *Rivera v. Senkowski,* 62 F.3d 80, 85 (2d Cir.1995).

---

**End of Document**
© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp., 1994 WL 714537 (W.D.N.Y.)
**(Cite as: 1994 WL 714537 (W.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, W.D. New York.
Frank DEMAIO, Plaintiff,
v.
Thomas COUGHLIN, III, Walter Kelly, J. Kihl,
Capt. Henneberg, John Glassheen, Carl Steinvall,
W. Stranahan, K. Countermine, S.F. Martin, D.
Bates, Shu Officer Booker, Sgt. Falcone and Con-
nie Mills, Defendants.

No. 89–CV–1237E(M).
Dec. 9, 1994.

Frank Demaio, pro se.

Asst. Atty. Gen. Gail Y. Mitchell, Buffalo, NY, for
defendants.

MEMORANDUM AND ORDER

ELFVIN, District Judge.

**\*1** The plaintiff, a prison inmate proceeding
*pro se,* brought this action pursuant to 42 U.S.C. §
1983 alleging, *inter alia,* that the defendants were
deliberately indifferent to his safety and well-being
in violation of his Eighth Amendment right to be
free from cruel and unusual punishments. These al-
legations arise out of the plaintiff's transfer in 1989
to the Attica Correctional Facility ("Attica"), his
detention in the Special Housing Unit ("SHU")
there for nine and one-half months and his alleged
need for protective custody status. Before this
Court are the motions of defendants Coughlin,
Kelly, Kihl, Henneberg, Glassheen, Steinvall, Fal-
cone and Mills [FN1] for summary judgment pursu-
ant to FRCvP [FN2] 56(b). Also before this Court is
the plaintiff's cross-motion for summary judgment.
Such defendants' motions will be granted and the
plaintiff's motion will be denied.

The plaintiff has been an inmate in New York's
prison system under the aegis of the Department of
Correctional Services ("DOCS") since October

1986. He has maintained since being incarcerated
that, because he had "ripped off" most of the major
drug dealers on the East Coast, there was an "open
contract" on his life and that he therefore required
protective custody. While being held in a New
York City jail on the charges that led to his incar-
ceration by DOCS, the plaintiff slashed his wrist
when he was being forced to leave protective cus-
tody within the jail. *See* Plaintiff's Cross–Motion
for Summary Judgment, at Exh. B (report of At-
tica's "Committee for Protective Custody"). In Feb-
ruary 1987, while at the Fishkill Holding Center,
the plaintiff wrote to defendant Coughlin, the
Commissioner of DOCS, and set forth a list of the
DOCS facilities—including Attica and the Clinton
Correctional Facility ("Clinton")—to which he
should not be transferred because such allegedly
"would place plaintiff's life in immediate jeopardy
due to his enemies." Amended Complaint, at ¶ 1.
The plaintiff did not name such enemies or particu-
larize why they might be present in such facilities.
He contends that he does not know their names be-
cause "these drug dealers are well insulated and do
not make themselves known." *Id.* at Exh. A. There-
after, the plaintiff was transferred to Clinton, where
at an undetermined time he was put in voluntary
protective custody. Both he and members of his
family began sending to Coughlin and others a
series of requests for transfer because of the
plaintiff's "enemy situation." All were denied, the
reason given being that no other facility was avail-
able. *Id.* at ¶¶ 2–7. The plaintiff was transferred to
Attica August 25, 1989 and apparently was not put
into protective custody until fifteen days thereafter.
On or about October 4th, after he had threatened to
cut his wrists, he was moved from protective cus-
tody to a cell in Attica's Mental Health Observation
Unit, which is under the jurisdiction of New York's
Office of Mental Health. For safety reasons the ob-
servation unit cells are equipped with thin mat-
tresses and the inmates are issued no clothing other
than underwear. After it apparently was determined
that the plaintiff was feigning suicidal tendencies as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

a way to stay within the unit, it was decided that he should be moved back to protective custody. Defendant Falcone came to plaintiff's cell October 12th and ordered him to leave the observation unit, but the plaintiff refused. Falcone then forcibly dragged him to the Special Housing Unit ("SHU") and reported him for the misbehavior. A Tier III disciplinary hearing ensued, the plaintiff was found guilty of disobeying a direct order and was sentenced to 30 days in the SHU. After his sentence had been served he disobeyed another direct order to leave the SHU, pleaded guilty to such at his November 15th disciplinary hearing (with the explanation that he refused voluntary protection status and general population status because he felt unsafe in either placement) and was sentenced to 60 more days in the SHU. This pattern repeated itself several more times until the plaintiff was transferred from Attica to Great Meadow Correctional Facility in May 1990.

**\*2** Summary judgment is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FRCvP 56(c). In making such a determination, a court must view the facts in the light most favorable to the non-movant and any doubts as to the existence of a genuine issue for trial should be resolved against the moving party. *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). The moving party bears the initial burden of establishing that no genuine issue as to a material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If, as here, the non-movant bears the burden of proof on a claim at trial, the moving party may satisfy its burden by demonstrating an absence of evidence to support an essential element of such claim. *Id.* at 325. Once the moving party has established its initial burden, the non-movant must set forth specific facts showing that there is a genuine and material issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Such a showing must consist of more than a "scintilla of evidence"; the non-movant must show that there is evidence from which a reasonable juror could re-

turn a verdict in his favor. *Id.* at 252. Thus, if the non-movant fails to make such a showing re any essential element of a claim, summary judgment against him on that claim is appropriate.

Turning to the allegations against Coughlin, the plaintiff contends that Coughlin was "deliberately indifferent" to his safety because he allowed the plaintiff to be transferred to Attica even though the plaintiff had told him that he had "enemies" there. An inmate has no constitutional right not to be transferred from one facility to another. *See Meachum v. Fano,* 427 U.S. 215, 225 (1976). While he does have a right to be protected from violence from other inmates— *see Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991)—, which might include the right not to be transferred to a prison where there is a known threat of death— *see Fitzharris v. Wolff,* 702 F.2d 836, 839 (9th Cir.1983)—, in order to be held liable for a failure to protect, an official must be shown to have demonstrated deliberate indifference to the inmate's safety. *See Hendricks v. Coughlin,* 942 F.2d at 109, 113. An official demonstrates deliberate indifference when he has actual or constructive notice of a specific risk to an inmate's safety and fails to take steps to protect the inmate from injury. *See Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (1989). Beyond the fact that the plaintiff can point to no harm that resulted when he was transferred from Clinton to Attica (other than being "stressed out"), he has also adduced no probative proof that Coughlin knew of a *specific* risk that even *might* have befallen him as a result of such transfer. His mere speculations concerning unnamed "enemies" who might do him harm are insufficient because, given that all the facilities had available voluntary protective custody status, Coughlin and all the other cognizant prison officials had no rational basis to believe that one facility would be safer than another. That the plaintiff and others for him called or wrote to Coughlin's office dozens of times concerning these speculations does not make them any more specific. Further, Clinton itself, like Attica, was one of the facilities to which the plaintiff had

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

originally demanded he not be sent. His safety needs having been met there, it was hardly unreasonable to believe that such needs could be met equally as well at Attica. For the same reasons, the plaintiff's claim that defendant Classification Analyst Glasheen was deliberately indifferent to his safety in allowing the transfer, will be dismissed, as will the claim against defendant Correction Counselor Mills that she lied to the plaintiff and his parents about the transfer and did nothing to stop it. FN3

**\*3** The plaintiff alleges that defendant Steinvall—a psychologist employed by the New York State Department of Mental Health who was assigned to Attica in October 1989—placed him in the Mental Health Observation Unit knowing that he was not mentally ill and in retaliation for the plaintiff's claimed need for protection. This claim is seriously undercut by the plaintiff's admission that he had threatened to cut his wrists, which strongly suggests that the decision to put him in the unit was an act of professional prudence. Regardless, the United States Court of Appeals for the Second Circuit has noted that prisoners' claims of retaliation are "prone to abuse." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). Given this reality, *Flaherty* directs that

> "[I]f the production of all relevant documents fails to add substance to the [prisoner's] allegations [of retaliation] and if the relevant officials submit affidavits explaining their reasons for the challenged actions, summary judgment dismissing the complaint may be granted." *Ibid.*

Steinvall has submitted such an explanatory affidavit (sworn to August 24, 1992) and the plaintiff can point to nothing beyond the conclusory allegations in the Amended Complaint which even hints that retaliation motivated Steinvall's actions. The claim against him therefore will be dismissed.

The claim against defendant Kelly, Superintendent of Attica, fails because the Amended Complaint makes no allegation that he was personally involved in, had knowledge of, or acquiesced in the cited incidents. (In fact, the only mention of Kelly in the Amended Complaint is in its caption.) Even if, as here, a defendant is in a high position of authority, such allegations are necessary to support a cognizable section 1983 claim. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978). Further, Kelly has submitted an affidavit (sworn to August 20, 1992) wherein he states he had no personal involvement in the matters alleged in the Amended Complaint. The claims against him therefore will be dismissed.

The plaintiff alleges that defendant Henneberg, who presided at two of the plaintiff's disciplinary hearings (on November 15, 1989 and January 8, 1990), denied him due process by not allowing him to answer the charges against him. Such allegation is meritless because the plaintiff admits to the charges that were the subject of the hearings—*i.e.,* his refusals to obey direct orders to leave the SHU—and admits that he refused to attend the hearings. Further, he never appealed Henneberg's decisions and thus never exhausted his administrative remedies, and he has offered no proof in response to the Henneberg's instant summary judgment motion to buttress the conclusory allegations in the Amended Complaint. The claims against Henneberg will therefore be dismissed.

The only allegation against defendant Falcone, a Correction Sergeant at Attica, is that he went to the Mental Health Observation Unit, ordered the plaintiff to go to protective custody and forcibly removed the plaintiff to the SHU after the plaintiff had refused his order. The plaintiff points to—and this Court knows of—no constitutional right of a prisoner to disobey a guard's order to move from one cell to another. Further, no damages are alleged to have occurred as a result of Falcone's actions, and the plaintiff again has offered only the bald allegations in the Amended Complaint. The claims against Falcone will therefore be dismissed.

**\*4** The claims against Kihl, the hearing officer who presided at the plaintiff's February 7, 1990 su-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 714537 (W.D.N.Y.)
**(Cite as: 1994 WL 714537 (W.D.N.Y.))**

perintendent's hearing, will be dismissed because, as this Court has previously ruled, Kihl is entitled to absolute immunity. *See Malinowski v. Kihl,* 91–CV–0301E (Memorandum and Order, signed August 23, 1993).

Accordingly, it is hereby *ORDERED* that the summary judgment motions of defendants Coughlin, Glasheen, Mills, Kelly, Kihl, Henneberg, Falcone and Steinvall are granted and the plaintiff's cross-motion for summary judgment is denied.

FN1. Defendants Countermine, Martin, Bates, Booker and Stranahan have not moved for summary judgment and thus this action remains open as to them.

FN2. Federal Rules of Civil Procedure.

FN3. The plaintiff has also made various additional allegations against Coughlin in a "Supplemental Complaint" filed July 27, 1993. These allegations are not properly before this Court because the plaintiff has never moved to amend his Complaint a second time. However, even if they were properly before this Court, they would be dismissed because they fail to implicate Coughlin's personal involvement in the wrongs therein alleged.

W.D.N.Y.,1994.
Demaio v. Coughlin
Not Reported in F.Supp., 1994 WL 714537 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.

Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

REPORT-RECOMMENDATION

SHARPE, Magistrate J.

I. *Introduction* [FN2]

> FN2. This matter was referred to the undersigned
> for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.[FN3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

III. *Facts* [FN4]

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

FN6. The defendants suggest that Garrett has

failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> FN7. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged violation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2015 WL 4394604
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edgardo L. LOPEZ, Plaintiff,

v.

N. WHITMORE, et. al., Defendants.

No. 9:13–CV–952 (BKS/
ATB).   |   Signed July 16, 2015.

**Attorneys and Law Firms**

Edgardo L. Lopez, Last Known Address, Syracuse, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Christopher W. Hall, Assistant Attorney General, The Capitol, Albany, NY, for Defendants.

**ORDER**

Hon. BRENDA K. SANNES, District Judge.

 *1 Plaintiff Edgardo L. Lopez, a former New York State inmate, commenced this civil rights action under 42 U.S.C. § 1983 raising federal and state claims against New York State Department of Correction officials arising out of plaintiff's confinement at Marcy Correctional Facility. Dkt. Nos. 1, 32. On October 9, 2014, defendants filed a motion for summary judgment which was referred to United States Magistrate Judge Andrew T. Baxter. Dkt. Nos. 69, 83. On May 20, 2015, Judge Baxter issued a Report–Recommendation, recommending that defendants' motion for summary judgment be granted, and that plaintiff's First Amendment and Eighth Amendment claims be dismissed without prejudice to refiling and that plaintiff's due process and state law claims be dismissed with prejudice. Dkt. No. 83, p. 24. Judge Baxter advised the parties that:

> Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL

PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing Small v. Sec. of Health & Human Servs., 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72.

Dkt. No. 83, p. 24. A copy of the Report–Recommendation was mailed to Lopez's last known address via certified mail. Dkt. No. 83. Lopez's copy of the Report–Recommendation was returned to the Court marked "Return to sender, unable to forward." Dkt. No. 85.

On June 8, 2015, Lopez filed a notice of change of address and a request for an extension of time to respond to the Report–Recommendation. Dkt. Nos. 86–87. Lopez noted that he received the Report–Recommendation that day at the public counter in the courthouse. Dkt. No. 87. The Court granted Lopez's request for an extension of time and, in a text order dated June 8, 2015, extended the due date for filing objections to June 22, 2015. The text order was mailed to Lopez's last known address. Lopez's copy of the text order was returned to the Court marked "Return to sender, not deliverable as addressed, unable to forward." Dkt. No. 89.

In a Decision and Order on June 29, 2015, the Court reminded Lopez of his obligation to notify the Court of any change in address, *see* Local Rule 10.1(c)(2), and provided Lopez an additional fourteen days to file his current address and any objections to the Report and Recommendation. Dkt. No. 90, pp. 2–4. The Court advised Lopez that if he failed to comply with the Decision and Order, the Court would "consider the Report and Recommendation as unopposed and review for clear error only." Dkt. No. 90, p. 4. The Decision and Order was served on Lopez via certified mail at his last known address. Dkt. No. 90. On July 8, 2015, the Court received an executed return receipt of delivery. Dkt. 91. Lopez has not, to date, filed any objections to the Report–Recommendation.

 *2 Accordingly, as no objections to the Report–Recommendation have been filed and the time for filing objections has expired, the Court reviews the Report–Recommendation for clear error. See Glaspie v. N.Y.C. Dep't of Corr., No. 10 CV 00188(GBD)(JCF), 2010 WL 4967844, at *1, 2010 U.S. Dist. LEXIS 131629, at *2–3 (S.D.N.Y. Nov. 30, 2010) (explaining that when no objections to report and recommendation are made, "the Court may adopt [it] if there is 'no clear error on the face of the record.' ") (quoting Adee Motor Cars, LLC v. Amato, 388 F.Supp.2d 250, 253 (S.D.N.Y.2005)). Having reviewed the Report and

Recommendation in its entirety and having found no clear error, it is hereby:

**ORDERED** that the Report–Recommendation (Dkt. No. 83) is **ADOPTED in its entirety** for the reasons stated therein; and it is further

**ORDERED** that the defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED;** and it is further

**ORDERED** that plaintiff's due process and state law claims are **DISMISSED with prejudice;** and it is further

**ORDERED** that plaintiff's remaining claims under 42 U.S.C. § 1983 relating to assault and retaliation are **DISMISSED without prejudice to refiling;** and it is further

**ORDERED** that the Clerk of the Court shall close this case; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Order as well as the Report–Recommendation (Dkt. No. 83) upon all parties in accordance with the local rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N .Y. 72.3(c) by the Honorable Brenda K. Sannes, United States District Judge.

In this civil rights action, plaintiff claims that in May 2013, several correctional officers assaulted him during his confinement at the Marcy Correctional Facility ("Marcy") in retaliation for filing a grievance, and then issued several false disciplinary charges against plaintiff to cover up their actions. (Amended Compl ., Dkt. No. 32, ¶¶ 26–55). Plaintiff amended his complaint in November 2013 to further allege that the disciplinary hearing related to these charges violated his due process rights. (*Id.* ¶¶ 60–74). Plaintiff also raises several state law tort claims in connection with the alleged assault. (*Id.* ¶ 77, 80, 82).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt. No. 69). Plaintiff has opposed the motion. (Dkt. No. 73) [1]. Defendants did not submit a reply.

For the reasons set forth below, this court recommends that defendants' summary judgment motion be granted. Plaintiff's claims should be dismissed because no rational fact finder could conclude that he exhausted his administrative remedies as to the assault and retaliation claims as required before filing an action under 42 U.S.C. § 1983, or that plaintiff failed to receive all the process that he was due during his disciplinary hearing. Plaintiff's state law claims, raised pursuant to the court's supplemental jurisdiction, should also be dismissed.

### *DISCUSSION*

### I. Summary Judgment

 **\*3** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States*

*v. Diebold, Inc.,,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin,* 467 F.3d at 272.

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 10 (N.D.N .Y. Apr. 24, 2006). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Id.,* 2006 WL 1133247, at *3 & n. 11 (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

## II. Exhaustion of Administrative Remedies

 **\*4**  Plaintiff has alleged that he was the victim of two separate assaults by Marcy Correctional Officers on the morning of May 7, 2013. (Amended. Compl., Dkt No. 32, ¶¶ 31–38, 43). Plaintiff further alleges that the assaults were in retaliation for a prior grievance which he had submitted against one or more of the defendants, and that the defendants then issued him disciplinary tickets for failing to obey orders and possessing a weapon in order to cover up their actions [2]. (*Id.* ¶ 55). Based on the record discussed below, the court concludes that no reasonable fact finder could conclude that the plaintiff had completed the administrative grievance process for these claims prior to commencing this federal proceeding. Accordingly, this court recommends that plaintiff's First Amendment retaliation claims and Eighth Amendment cruel and unusual punishment claims be dismissed for failure to exhaust administrative remedies.

## A. Legal Standards
The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the superintendent of the relevant facility. *Id.* § 701.5(c). Adverse decisions at the superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

 **\*5**  At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the

law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. [3] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. See *Brownell v. Krom*, 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill*, 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford*, has been a matter of some discussion. [4] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g., Messa v. Goord*, 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York*, 311 F. App'x 397, 399 (2d Cir.2009).

### B. Application

Plaintiff filed a grievance on June 17, 2013, after being transferred to Downstate Correctional Facility ("Downstate"), alleging that on May 7, 2013, certain Marcy Correctional Officers verbally and physically abused him following a pat-down frisk while plaintiff was en route from the Marcy housing unit to the facility's infirmary. (Def. Statement of Material Facts, Dkt. No. 69–1, ¶ 4; Pl's Resp. to Def. Statement of Material Facts, Dkt. No. 73, 4). This grievance was acknowledged and forwarded for investigation by IGRC on June 19, 2013. (Dkt. No. 73–2, Pl's Ex. 3(B)). On September 17, 2013, the Downstate Superintendent denied plaintiff's grievance. (Hall Aff, Dkt. No. 69–3, Ex. 3; Dkt No. 73–2, Pl's Ex. 3(C)). On September 23, 2013, Plaintiff appealed this determination to the Central Office Review Committee. *Id.* On June 11, 2014, CORC issued its decision denying the grievance, the final step in the administrative process. (Dkt. No. 73–2, Pl's Ex. 3(D)).

While the administrative grievance process was ongoing, Plaintiff commenced this litigation on August 12, 2013, alleging essentially the same facts as his grievance. (Dkt. No. 1, Compl.). Plaintiff later submitted an Amended Complaint dated November 3, 2013 which restated the assault and retaliation claims and added a due process claim arising out of the related disciplinary hearing. (Dkt. No. 32, Amended Compl.)

In their motion for summary judgment, defendants argue that plaintiff failed to exhaust his administrative remedies relating to his assault and retaliation claims prior to commencing this federal litigation [5]. Plaintiff argues that his administrative remedies were exhausted upon filing his grievance on June 17, 2013, and that "[i]t is common knowledge that one not need to wait on the CORC decision in order to file a civil action against New York State Department of Corrections and Community Supervision (N.Y.SDOCCS) employees for committing such brutally physical body harm upon plaintiff." (Pl's Mem. of Law, Dkt. No. 73–1, at 7). Plaintiff also asserts that his administrative grievance was not resolved within a reasonable time, as it took three months to receive the Downstate Superintendent's determination, and another ten months before the CORC determination was issued. (*Id.* at 8).

**\*6** "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532. Plaintiff did not complete the state administrative grievance process for the assault and retaliation claims before commencing this litigation, and therefore failed to exhaust his administrative remedies in accordance with the PLRA. The only excuse offered by plaintiff, that the administrative grievance process took an unreasonably long time, is unavailing. (Pl's Mem. of Law, Dkt. No. 73–1, at 8). If the superintendent failed to timely respond to plaintiff's grievance, Plaintiff needed to appeal that failure to the CORC before commencing this litigation. "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA." *Croswell v. McCoy*, 01–CV–0547, 2003 WL 962534, at \*4 (N.D.N.Y. Mar.11, 2003) (Sharpe, M.J.). [6]

In applying the Second Circuit's three-party inquiry, plaintiff has offered no evidence to suggest that the grievance process was unavailable to him, that the defendants are estopped from asserting the defense of failure to exhaust, or that there are any other special circumstances under *Hemphill* and its progeny that would excuse plaintiff's failure to exhaust his administrative remedies.

In support of defendants' motion, Jeffrey Hale, the DOCCS Assistant Director of the Inmate Grievance Program ("IGP") and the custodian of records for CORC, which maintains files of grievance appeals by inmates, submitted a declaration based upon his review of those records. (Dkt. No. 69–2). Ass't

Dir. Hale certified that CORC records contained five separate grievances filed by plaintiff for the period between September 2012 and May 2014. (Hale Decl., Dkt. No. 69–2, ¶¶ 6–7, 10, and Ex. B.).

During his August 26, 2014 deposition, plaintiff acknowledged that he was familiar with the DOCCS grievance process and understood that CORC is the final administrative step for deciding an inmate grievance. (Hall Aff, Dkt No. 69–3, Ex. 1 at 18). While plaintiff asserts that he was discouraged from reporting the alleged assaults immediately afterwards by threats from one or more of the defendants, plaintiff not only filed a detailed administrative grievance, but also raised the assault and retaliation allegations during his disciplinary hearing. *See, e.g., Black v. Fischer,* No. 12 Civ. 2341, 2013 WL 1314940, at *8–9 (S.D.N.Y. Mar. 28, 2013)* (the plaintiff's claim that he was deterred from pursuing grievances by threats from a defendant was overcome by the fact that plaintiff filed other grievances and complaints during the relevant time period).

It is true that under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding. *Giano,* 380 F.3d at 678–79; *Johnson,* 380 F.3d at 697. However, such exhaustion is essentially limited to instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, and (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. *Murray,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *3 (collecting cases). Here, where plaintiff filed a grievance eleven days after the hearing, there is no indication that he reasonably believed that the disciplinary hearing was his only available remedy. In addition, the disciplinary hearing officer, defendant Cavaleri, informed plaintiff that his testimony regarding the assault was "not credible," and plaintiff declined to call any witnesses or question any witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4). No rational fact-finder could conclude that plaintiff had articulated or pursued his claim in a manner that afforded prison officials an opportunity to investigate his claim.

**\*7** During the pendency of this litigation, plaintiff received a decision by the CORC, dated June 11, 2014, upholding the Superintendent's denial of the grievance. (Dkt. No. 73–2, Pl's Ex. 3(C)). While it is true that this decision means that plaintiff has now exhausted his administrative remedies,

the Second Circuit has held that a plaintiff must exhaust his remedies *before* filing his federal action, and that the court must dismiss plaintiff's complaint notwithstanding his subsequent exhaustion. *Neal v. Goord,* 267 F.3d 116, 122–23 (2d Cir.2001).

Because plaintiff failed to exhaust his administrative remedies by failing to wait for the CORC's decision, this court is constrained to recommend dismissing this complaint without prejudice. Plaintiff may immediately re-file his action on the First and Eighth Amendment claims because he has now exhausted his remedies. As in *Neal,* plaintiff may find that requiring him to initiate a new law suit is "judicially inefficient." *Id.,* 267 F.3d at 123. However, the Second Circuit specifically rejected such an argument, finding that "if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court will have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset." *Id.*

## II. Due Process–Disciplinary Hearing

### A. Plaintiffs Request for Voluntary Dismissal

Plaintiff amended his complaint in November 2013 to add a due process cause of action alleging deficiencies in the disciplinary hearing arising out of the incidents at Marcy. (Dkt. No. 32). The Amended Complaint was filed after plaintiff's administrative appeal was denied, and therefore plaintiff has exhausted his administrative remedies as to the due process issue. *See Chavis v. Goord,* No. 9:00–CV–1418 (LEK/DEP), 2007 WL 2903950 (N.D.N.Y.2007) (citing *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Defendants seek summary judgment on the merits of this claim, arguing that plaintiff was afforded all process that was due.

In response, plaintiff has requested that the court dismiss his due process claim, in order to focus on the alleged assault. However, since plaintiff's request for dismissal comes after the defendants have answered (Dkt. No. 37) and moved for summary judgment (Dkt. No. 69), and the parties have not stipulated to dismissal, plaintiff has no right to a voluntary dismissal. Fed.R.Civ.P. 41(a)(1). Instead, dismissal lies in the discretion of the court. *See* Fed.R.Civ.P. 41(a)(2) ("Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."); *see also Lebewohl v. Heart Attack Grill LLC,* 890 F.Supp.2d 278, 304 (S.D.N.Y.2012) ("A trial court

has great discretion in considering whether to grant a motion for voluntary dismissal under the rule.").

The circumstances of this case weigh heavily in favor of denying plaintiff's motion for voluntary dismissal and deciding defendants' motion for summary judgment on the due process claim. These claims have been pending since 2013, and the parties have engaged in discovery, including the deposition of plaintiff. (Hall Aff., Dkt. No. 69–3, Ex. 1). Defendants filed a summary judgment motion, fully supported by numerous affidavits and exhibits, to dismiss plaintiff's claims with prejudice, in October 2014. (Dkt. No. 69). Plaintiff, who requested permission in November 2013 specifically to add the due process claims, provides no justification for withdrawing these claims, other than stating that his "complaint is not about the Tier Hearing nor Due Process regarding the tier hearing, but the factual facts that the defendants physically assaulted plaintiff...." (Pl.'s Mem. of Law, Dkt. 73–1, at 3).

**\*8** At this stage of the proceedings, it would be unfair and unduly prejudicial to the defendants to allow plaintiff to withdraw his due process claim, particularly given the potential that plaintiff may re-file this litigation in order to raise the now administratively exhausted assault claims. *See, e.g., Murray v. Fischer,* No. 9:11–CV–225 (GLS/ATB), 2015 WL 457693, at \*2–3 (denying prisoner's motion to dismiss certain claims without prejudice and granting defendants' motion for summary judgment instead); *Emory v. New York,* No. 11–CV–1774, 2013 WL 1881009, at \*3 (E.D.N.Y. May 6, 2013) (denying plaintiffs' motion to dismiss action without prejudice where plaintiffs failed to proffer reasons why their "voluntary" dismissal came so late in the litigation, and only after the defendants marshaled strong arguments in favor of dismissal in substantive motions, both because it reflects plaintiffs' lack of diligence and because it may subject defendants to the burden of relitigating these same claims); *Krivchenko v. Clintondale Aviation, Inc.,* No. 1:13–CV–820 (TJM), 2014 WL 4684808, at \*4 (N.D.N.Y. Sept.18, 2014) (denying voluntary motion to dismiss action, filed without adequate explanation after defendant filed a motion for summary judgment motion, because it indicates an "an undue vexatiousness" and could potentially subject the defendants to the burden of unnecessary relitigation). The court will now address the merits of plaintiff's due process claims.

**B. Legal Standards**

In order to begin a due process analysis, the court first determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ...., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84.

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

**\*9** The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

In certain cases, an inmate has a limited right to assistance with his disciplinary hearing. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is

confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

## C. Application

Since the disciplinary hearing resulted in a one year sentence to the special housing unit ("SHU"), plaintiff is considered to have a liberty interest subject to due process protection. Plaintiff alleges that defendants issued him fabricated disciplinary tickets to cover up the alleged retaliatory assault, leading to procedural due process and privacy violations. It is well established that fabricated or false disciplinary charges do not violate an inmate's due process rights, so long as an inmate received a proper disciplinary hearing, with a determination based upon "some evidence." *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Therefore, the analysis focuses on the disciplinary hearing itself, and this court recommends that defendants' motion for summary judgment be granted.

### 1. Adequacy of Assistance at the Hearing

Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988)). Plaintiff alleges that he requested assistance, but that the employee assistant, who is not named as a defendant, refused to help plaintiff locate relevant documents and threatened physical violence. (Amended Compl., Dkt. No. 32, ¶ 68).

At the beginning of the disciplinary hearing, defendant Cavaleri inquired about the pre-hearing assistance, and asked whether plaintiff wanted to identify any witnesses or make any other requests before the hearing commenced. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 4). At the close of the hearing, plaintiff was also given an opportunity to raise any issues on the record. (*Id.* at 36). Plaintiff declined to raise any issues before or after the hearing about the quality or conduct of his pre-hearing assistant. Plaintiff's bare allegations in the Amended Complaint, which do not identify the offending officer, are not sufficient to overcome defendants' motion for summary judgment. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary

judgment once the moving party has set forth a documentary case"). Moreover, even assuming for purposes of this motion that plaintiff's allegations are accurate, plaintiff waived any objection to inadequate assistance when he failed to raise the issue during the disciplinary hearing. *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (plaintiff waived right to object to allegedly inadequate assistance when he did not raise the issue when questioned by hearing officer); *Hailey v. Provost,* No. 94–CV–1616 (RSP/DS), 1997 WF 627547 at *2 & n. 3 (N.D.N.Y., Oct. 9, 1997) (inmate waived right to effective employee assistance by specifically answering "no sir" after hearing officer asked if he needed any additional assistance).

### 2. Use of OMH Information

**\*10** Plaintiff alleges that defendant Cavaleri's consideration of testimony from State Office of Mental Health ("OMH") staff regarding plaintiff's psychiatric and medical history violated his due process right to privacy. (Amended Compl., Dkt. No. 32, 71). Defendant Cavaleri advised plaintiff during the hearing that such testimony was admitted and would be considered, but did not disclose the contents of that evidence. Following policy, the OMH testimony was heard without the plaintiff present. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 36).

In the United States Constitution, there exists a right to privacy, protecting an individual's interest in avoiding the disclosure of personal matters. *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994) (citing *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)). This right is protected by the Due Process Clause. *O'Connor v. Pierson,* 426 F.3d 187, 201 (2d Cir.2005) (citing *Whalen,* 429 U.S. at 598–600). The right to privacy has also been "characterized as a right to 'confidentiality,' which 'includes the right to protection regarding information about the state of one's health.' " *Matson v. Bd. of Ed. of City School Dist. of New York,* 631 F.3d 57, 64 (2d Cir.2011) (quoting inter alia *Doe,* 15 F.3d at 267).

With respect to the "disclosure" of medical information, an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Id.* (citations omitted). Prison officials may impinge upon the inmate's privacy right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999).

The Second Circuit has concluded that the OMH policy of offering such testimony outside the patient's presence during a prison disciplinary proceeding is constitutionally valid and does not violate any due process right. *See Powell v. Coughlin,* 953 F.2d 744, 749 (2d Cir.1991). As the disclosure of unfavorable mental health evaluations in an inmate's presence will likely impair the inmate-clinician relationship, and the disclosure of favorable evaluations may encourage inmates to "act out" in order to obtain such findings, the policy of hearing mental health testimony outside the inmate's presence, followed in this case, is reasonably related to legitimate penological interests and is an appropriate measure. *Id.*

### 3. "Some" Evidence Standard

Plaintiff alleges that defendant Cavaleri was biased, that plaintiff's guilt was not based upon reliable evidence, and that Cavaleri failed to consider plaintiff's testimony, particularly about injuries following the alleged assault. (Amended Compl., Dkt. No. 32, 74). Defendants argue that the disciplinary hearing transcript shows that defendant Cavaleri explained plaintiff his rights, read him the charges and took his not guilty plea. (Def. Mem. of Law at 10–12). Plaintiff was allowed to offer testimony, and given the opportunity to call and question witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 8–22). Plaintiff declined to propose questions for any witness. (*Id.*). When the witness testimony was concluded, plaintiff was given an opportunity to rebut their statements. (*Id.* at 26–30). After plaintiff raised the issue of injuries suffered in the alleged assault, defendant Cavaleri reviewed plaintiff's medical records with the assistance of a physician's assistant. (*Id.* at 35). When issuing his disposition, defendant Cavaleri noted the consistent testimony of seven witnesses, and the lack of any evidence that would support plaintiff's testimony (*Id.* at 39).

**\*11** As the hearing officer, Defendant Cavaleri was authorized to make credibility determinations. *See Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 WL 3785771, at \*11 n. 25 (N.D.N.Y. Aug.5, 2010) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *Rep't. Rec. adopted,* 2010 WL 3762016, at \*1 (N.D.N.Y. Sept.20, 2010). It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Alien v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.*

An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 76 (2d Cir.2004) (citing *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). In this case, there was sufficient evidence supporting the hearing officer's determination. Defendant Cavaleri specifically noted the consistent testimony of seven witnesses, and the lack of evidence to support plaintiff's testimony, which was deemed not credible.

The record evidence supports the conclusion that plaintiff's due process rights were satisfied in his disciplinary hearing. Accordingly, this court recommends that defendants' motion for summary judgment as to plaintiff's due process claims against defendant Cavaleri be granted. Because his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that this court has found comported with due process, summary judgment should also be granted with respect to defendant Prack [7].

### III. State Law Claims

Plaintiff asserts a number of tort claims including assault and battery, invasion of privacy, sexual harassment, infliction of mental, emotional and physical distress and negligence in connection with the incidents at Marcy, all arising out of New York State statutory and common law. (Am. Compl., Dkt No. 32, 77, 79, 80, 82). Defendants have moved for summary judgment dismissing these claims, arguing that pursuit of such tort claims in this action is statutorily precluded pursuant to New York Corrections Law § 24. (Def. Mem. of Law, Dkt. No. 69–4, at 12–13). Plaintiff counters that the United States Supreme Court ruled Corrections Law § 24 unconstitutional, and that, in any case, state law immunity does not extend to excessive force claims, which fall outside the ordinary scope of a correctional officer's employment duties. (Pl.'s Mem. of Law, Dkt. No. 73–1, at 9–12).

**\*12** New York Corrections Law § 24 precludes "the assertion of claims against corrections officers in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring

a claim for damages arising out of the acts committed by corrections officers within the scope of their employment." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996).

In *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009), cited by plaintiff in his response (Pl's Mem. of Law, Dkt. No. 73–1, at 11), the Supreme Court held that New York Corrections Law § 24 was unconstitutional to the extent that it precludes inmates from pursuing § 1983 actions in state or federal court. However, plaintiff overstates the scope of *Haywood* as it pertains to this litigation.

Although the *Haywood* decision found New York Corrections Law § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under federal law, such as § 1983. In applying supplemental jurisdiction, federal courts are bound to apply state substantive law to claims brought pursuant to state statute or common law. *Baker,* 77 F.3d at 15. The courts of this district have unanimously held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS officials. *See, e.g., Rucano v. Koenigsmann,* No. 9:12–CV–35 (MAD/ RFT), 2014 WL 1292281, *16 (N.D.N.Y., Mar.31, 2014); *Rounds v. Thompson,* No. 9:12–CV–953, 2013 WL 3187074 at *4 (N.D.N.Y.2013) (collecting cases). If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court must not allow that claim to be appended to a federal law claim in federal court. *Baker,* 77 F.3d at 15.

Plaintiff alleges that he was assaulted during a pat-down by correctional officers as he traversed a prison walkway, and then again while being transported and questioned about the incident. (Amended Compl. Dkt No. 32, ¶ 24–43). Transporting an inmate and subduing that individual, should a disciplinary issue arise, is 'common conduct for a DOCCS officer or sergeant.' " *Crosby v. Russell,* No. 9:10–CV–595, 2014 WL 3809129, *5 (N.D.N.Y.2014) (quoting *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision,* No. 11–CV–0079, 2013 WL 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, 'no matter how irregularly, or with what disregard of

instructions.' " *Id.,* 2014 WL 3809129, *6 (quoting *Cepeda v. Coughlin,* 128 A.D.2d 995, 996, 513 N.Y.S.2d 528 (3d Dep't 1987)). Therefore, based upon the allegations in the amended complaint, this court recommends that defendants' motion for summary judgment as to plaintiff's state law claims be granted, without leave to amend.

Even if New York Corrections Law § 24 did not apply, this court would still recommend dismissal of plaintiff's state law claims in light of the recommendations of dismissal of all federal causes of action in plaintiff's amended complaint. *See* 28 U.S.C. § 1367(c)(3) (the district court may decline to exercise supplemental jurisdiction over a claim if all other claims over which the court has original jurisdiction have been dismissed); *City of Chicago v. International College of Surgeons,* 522 U.S. 156, 172, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997); *Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir.1994).

**\*13 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 69) be **GRANTED,** and that plaintiff's First Amendment and Eighth Amendment Claims be **DISMISSED WITHOUT PREJUDICE TO REFILING,** and that plaintiff's due process and state law claims be **DISMISSED WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed May 20, 2015

**All Citations**

Slip Copy, 2015 WL 4394604

---

Footnotes

1    Plaintiff requested oral argument on defendant's motion. That request is denied, and this court will make its report and recommendation based upon the parties' papers and the record.

2    Defendants assert that plaintiff has failed to state a claim in connection with the misbehavior reports, since plaintiff's allegations of retaliation are conclusory and defendant was found guilty based upon the evidence at his disciplinary

hearing. (Def. Mem. of Law, Dkt. No. 69–4, at 8–10). In his response, plaintiff has requested that the court dismiss the claim for retaliatory misbehavior reports in order to focus on the assault claim. (Pl.'s Mem of Law, Dkt. No. 73–1, at 9). Because I am recommending that defendants be granted summary judgment on the retaliation claim due to plaintiff's failure to exhaust administrative remedies, I do not need to address whether summary judgment should be granted on the merits on this claim.

3     *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

4     See, e.g., *Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009).

5     Defendants had previously raised the failure to exhaust administrative remedies as an affirmative defense in their answer to the Amended Complaint. (Dkt. No. 37, Def.Answer, 12).

6     The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. 7 N.Y.C.R.R. § 701.6(g)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level, including the CORC, in order to properly complete the grievance process. *Accord, Murray v. Palmer,* 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, *2 & nn. 4, 6 (N.D.N.Y. March 31, 2010).

7     The court notes that if plaintiff had stated a valid due process claim, the fact that defendant Prack affirmed the disciplinary finding could constitute sufficient personal involvement. *See Thomas v. Calero,* No. 09–CV–5209, at *11–18 (S .D.N.Y. Mar. 17, 2011) (Rep't.-Rec.) (lengthy discussion of personal involvement as it relates to the affirmance of a disciplinary hearing and determination that such a claim would survive a motion to dismiss); *Rodriguez v. Selsky,* No. 9:07–CV–432, 2011 WL 1086001, at *4–7 (N.D.N.Y. Jan.25, 2011) (Rep't–Rec.), *adopted,* 2011 WL 830639 (N.D.N.Y., Mar.3, 2011).

---

**End of Document**                                                           © 2015 Thomson Reuters. No claim to original U.S. Government Works.